**OVERFIELD et al. v. PENNROAD CORPORATION et al.**
**Nos. 258, 938.**

District Court, E. D. Pennsylvania.
Jan. 19, 1943.

See, also, 39 F.Supp. 482.

Daniel O. Hastings, of Wilmington, Del., Philip H. Strubing, of Philadelphia, Pa., R. E. Lee Marshall and George C. Doub, both of Baltimore, Md., Hugh F. O'Donnell, of New York City, Caleb R. Layton, 3rd, of Wilmington, Del., Harold J. Conner, of Philadelphia, Pa., Daniel W. Blumenthal, of New York City, and Macin E. Estill, Lynn L. Detweiler, Harry R. Axelroth, James McG. Mallie, and Hugh Roberts, all of Philadelphia, Pa., for plaintiffs.

C. B. Heiserman, John Dickinson, John B. Prizer, Philip Price, Robert T. McCracken, George C. Chandler, Wm. Clarke Mason, W. Heyward Myers, Jr., Thomas B. K. Ringe, Ernest R. von Starch, R. Sturgis Ingersoll, Warwick Potter Scott, Ballard, Spahr, Andrews & Ingersoll, Thomas Stokes, and John Sailer, all of Philadelphia, Pa., Elder W. Marshall, of Pittsburgh, Pa., and Lewis M. Stevens, Medford J. Brown, and Stradley, Ronon & Stevens, all of Philadelphia, Pa., for defendants.

WELSH, District Judge.

Following the filing of the opinion herein, three investment experts were appointed to advise the Chancellor as to the fairest possible measure of the defendant's financial liability in accordance with the conclusions and the principles discussed in the

opinion. The experts have made a thorough study of the problem and have filed their report giving a comprehensive analysis of the transactions involved, and their combined opinion as to the measure of the damage in each investment instance, with one exception. The report recites that consideration has been given to all of the elements commented upon by the Court, including the purposes and relationships of the parties, the conditions and the trends of the times, and the relative equitable rights of the parties in interest. There is also included much of the material upon which their analysis was based. Thereafter the experts appeared for examination by counsel and an opportunity was had to determine the process by which their conclusions were reached and to test the soundness of their judgment.

Fortified by such report and the testimony of the able experts called by the plaintiff and defendant and the briefs and arguments of counsel, it becomes the Chancellor's duty to fix the measure of financial liability to be imposed upon the defendant Pennsylvania Railroad Company. It must be borne in mind, however, that in the performance of this duty the element of equitable justice must predominate rather than a resort to mathematical calculation, and that more weight must be given to the relative rights and obligations of the parties than to the establishment of a technical yardstick with which to exactly measure values, losses or liability.

In explanation of their conclusions and for the purpose of establishing a common basis for the comparison of Pennroad investments with other transactions of simlar character, the experts prepared a composite schedule of the earnings, market values and dividends of 13 Class One railroads. They declared, however, that the figures so developed were not intended to be an exact standard against which the price of Pennroad's purchases could be compared; but that such figures do "develop a pattern that has a comparative, if not absolute, value", and that the dollar figures arrived at involved the exercise of judgment. In the exercise of that judgment founded upon their impressions and appreciation of conditions at and after the time of the investments and of the relationships of the parties, they concluded that the price paid for Detroit, Toledo & Ironton Railroad was a proper one, no loss has been suffered, the risk was justified, and that no liability therefor should be imposed upon the defendant.

Defendant's counsel concur in the conclusion reached by the experts as to D. T. I., but the complainants take exception on the ground that the composite capital earnings and dividend records of the 13 railroads as compiled by the experts does not form a proper basis for comparison of values or for the measurement of liability. It may be pointed out, however, that the composite schedule has not been used as the exact measure of value or liability, but only as a common basis for the comparison of railroad investments. The experts have noted that capitalization of expected earnings is a guide to a range of value, and past earnings to expected earnings. Past earnings may be of help in estimating the future earnings of any particular company, but the exercise of judgment, having regard to all the circumstances, is particularly essential. Investment has for its purpose the assurance of future benefits, through an estimation of trends and possibilities which necessarily involves judgment and discretion. The experts have exercised their judgment fairly and impartially and we are not disposed to disregard their reasoning as to D. T. I. by assuming that it is faulty or that the comparisons made are the sole basis of their conclusion. The Chancellor declines to hold the defendant financially liable for Pennroad's investment in D. T. I.

As to the Pittsburgh & West Virginia investment, it will be recalled that at the instance of the railroad president, who was also a director of Pennroad, the latter company authorized the purchase of 220,000 shares at $170.00 per share in pursuance of an agreement previously reached with the principal stockholders of P. & W. Va. stock. The facts disclosed at the trial, and the experts also found, that pools had been operated, and a reckless dividend policy followed, for the purpose of influencing the market price of the stock, and that therefore the market quotations formed no accurate basis of value.

The experts reviewed the history of the road, its financial structure, the uncertainties and hazards incident to investment therein, and they compared its financial structure, earnings and future prospects with the composite schedule of the 13 railroads previously referred to. Their analysis applied various standards to the investment and commented upon the elements which rendered it impossible to actually

measure the loss or risk imposed upon Pennroad by its investment therein made for the benefit of the Penna. Railroad. Taking all factors into account and giving them the comparative weight which the experts' judgment indicated was in accordance with the opinion filed, they set $105.00 as a value for the common stock and $24.00 for the preferred as being within the fair price range for the stocks purchased. It was expressly declared, however, that they did not adopt such figures because they were a result of a calculation, but because they were within the price range which a purchaser might pay, taking all factors into consideration including the market value of control, but uninfluenced by a desire to acquire that control for the benefit of any particular railroad. The experts found that the difference between the price paid and the value fixed by them was $9,140,130.00 which represented the measure of liability which should be imposed upon the defendant by virtue of the Pittsburgh & West Virginia purchase.

Defendant takes exception on the ground that the experts' conclusion is predicated upon a number of assumptions which are either erroneous or subject to dispute, and because of their failure to attach to certain conditions and estimates the importance to which the defendant believed they were entitled. Complainants find no fault with the reasoning and the process by which the liability was reached, but contend that the damages should include an additional $4,-633,595.57 representing the cost of underwriting the issue of Pennroad stock, the proceeds of which were used to purchase the Pittsburgh & West Va. securities.

A review of the facts, the comprehensive analysis and comments of the experts, and of the conditions and influences incident to the Pennroad investments, confirms the impression that the judgment of the experts is adequately supported by a proper appreciation of the problem, proof of the pertinent facts and a fair basis of comparison. It is obvious that their combined opinion is founded upon their understanding of the elements and influences which combined to justify a mental conclusion. Whether those elements or influences were comparisons, calculations, certain estimates, or their own knowledge and experience must be left to those charged with the duty of reaching the conclusion. If their opinion is reasonably supported by an intelligent appreciation of the circumstances and problem, there would appear to be no reason for dis-

regarding it simply because they failed to adopt some other and different impression or interpretation of the elements before them.

■ The Chancellor is satisfied from all the evidence in the case that the measure of liability which should be imposed upon the defendant by virtue of the purchase of the Pittsburgh & West Virginia should be fixed at $9,140,130 and so finds.

■ This we are satisfied is a fair and equitable measure of the damages to be charged against the defendant arising out of the P. & W. Va. purchase. The expense of underwriting the issue of Pennroad stock sold with the view to buying the P. & W. Va. stock, although incurred at the instance of the Penna. Railroad, is not a part of the investment itself and should not be included in the damages. The underwriting expense was a necessary incident to the sale of the Pennroad stock, and the sale of such stock was the means by which the funds for the P. & W. Va. were provided. It was, however, incurred for corporate purposes, regardless of what was done with the proceeds of the issue and it would have been incurred in connection with such issue whether the proceeds were intended to be invested in a proper or improper investment, and at a fair price or otherwise. Such expense is not an inseparable part of the damages arising out of the P. & W. Va. investment and we decline to include it.

The investment experts, after briefly reviewing the circumstances of the Canton Co. purchase and the conditions of the respective parties, acknowledge their inability to render any assistance in measuring the defendant's liability as to that investment. They point out that the earning experience of this company means little, and that there are no satisfactory market values which could be of assistance in appraising the Canton Railroad as a terminal property. Its value was relatively small compared to the other properties of the Canton Co., although the acquisition of the Canton Railroad was clearly the moving reason for Pennroad's purchase.

The experts suggest as a possible solution, that the Penna. Railroad take over the Canton Co. from Pennroad at cost. The carrying out of such suggestion would eliminate a substantial problem and would in all probability be mutually satisfactory to the parties. Penna. Railroad would acquire ownership of the terminal railroad

facilities which it desired at the time of the Pennroad purchase, and Pennroad would have its capital investment restored in addition to the earnings received. It is not practical, however, because the acquisition of the Canton Co. by the Penna. Railroad could only be lawfully accomplished with the approval of the Interstate Commerce Commission, and this Court has no jurisdiction to effectuate or participate in promoting such acquisition. It is therefore necessary to examine the circumstances in the light of the principles previously discussed and to arrive at the solution which seems most equitable to all concerned.

The purchase of Canton Co. stock by Pennroad constituted an investment made as a result of Penna. negotiations, prompted by the railroad's desire to acquire the Canton Railroad and to prevent it from being taken over by competitors. This was found to be a breach of the fiduciary obligation of the defendant in that it was intended primarily to benefit the Penna. Railroad. The possible remedies for breach are, either an award of the whole sum, or an award of the difference between the price paid and the actual value of the property purchased. We have previously said that "the equities of this case do not demand the imposition of the full possible liability upon the defendant", and have tried, with the assistance of the experts, to establish a fair and equitable measure of redress consistent with the relative rights of the parties and the degree of their participation and responsibility in the transactions in question.

From the experts' report it may be assumed that it is impossible, as a practical matter, to establish a difference between cost and actual market value, and that such measure of damages may not be used in this case. It is likewise inadvisable to charge the defendant with the whole investment and to hold that it is entitled to the property. The alternative suggested by counsel, that the stock he sold at public sale with certain limitations and that the defendant be charged with the loss resulting, offers no assurance that the price received would be adequate or a proper measure of the value of the property to either Pennroad or to the Penna. Railroad.

The purchase price of Canton Co. was $13,432,814.00 or $611.00 per share. Stock exchange transactions were so few and infrequent that the sale prices furnished no fair measure of value. Much of the income of the Canton Co. was from the sale of real estate holdings and the usual rules of valuation based on earnings from operations are not applicable. The complainants fixed valuations ranging from $2,772,000.00 to $6,241,000.00 based respectively upon average net worth, average earnings, dividends, and stock market prices. They also call attention to the valuation of $9,500,-000.00 at which the Penna. Railroad believed the Canton Co. should be bought prior to 1929, and urged that the difference between the price paid and such of those valuations as the Court shall choose is the measure of damages to be imposed. On the other hand the defendant contends that the $14,000,000.00 appraisement made at the instance of the Canton Co. early in 1929 represented the actual value, that the investment has been a profitable one to Pennroad, and that no financial liability should be imposed upon the defendant.

In view of the manifest difficulties attendant upon the fixing of a fair value of Canton Co. as of 1929, the grave doubt as to whether any real damage has been suffered by Pennroad from its Canton Co. investment, and the failure of the complainants to clearly establish a basis of damages suffered as a result of defendant's breach of trust, it does not seem essential that the Chancellor should in this case make an award based upon the Canton Co. purchase. Under the present circumstances any measure of damages determined upon might with some justification be deemed an arbitrary one, and in view of the evidence that Pennroad has not and probably will not suffer financially because of its purchase of Canton Co. for the benefit of the railroad, the defendant will not be charged with any loss arising out of the Canton Co. investment.

The report of the experts on the investment in the Seaboard Air Line Railway Co. appears to have been based upon an analysis of the underwriting agreement under which the stock was acquired, and resume of the market transactions in the stock at and about the time of the investment. The experts declare that a return on the stock was "speculative as to both time and amount, but in the light of the proposed reorganization and refinancing, investors, as reflected by a reasonably broad and accurate market, believed there was a future for the equity in this property." They concluded that the substantial loss suffered by Pennroad was clearly due to the general break in the security market between October 1929 and January 1930,

and that no part of the loss should be charged to the defendant.

Bearing in mind the finding that the Seaboard investment, inter alia, was prompted by the Penna. Railroad to further its interests and influence, and that the risk thereof was solely upon Pennroad, it is important to inquire more extensively into the elements which might determine the actual value, the prospects of the Seaboard and the responsibility for the loss sustained. This purchase differs materially from the D. T. I. and others, and in measuring the liability to be imposed, consideration must be given to the general background, experience and prospects of the line. The experts, although characterizing the investment as speculative, justify the hopefulness and optimism of the investors upon the market activity and the expectation that the refinancing would improve the equity of the stockholders. On the other hand it is argued by the complainants that an analysis of the railroad shows conclusively that the common stock had no value whatever, that the only possible purpose to be served was that of the Penna. Railroad and that the entire loss must therefore be charged to the defendant.

The acquisition of Seaboard, unlike the other railroad investments, grew out of an underwriting arrangement. Pennroad and others entered into an agreement on October 9, 1929 to underwrite a proposed offering of 1,900,000 shares of Seaboard stock at about $12. It undertook to purchase 25% of all stock taken up by the syndicate, but not less than 125,000 shares if that much were acquired by the syndicate, and if the amount were less, it was to receive certain compensation for the underwriting. Although the arrangement has been variously described in the arguments as a purchase, an underwriting, and a reinsurance of the underwriting, it is obvious that its object was to enable Pennroad to acquire not less than 125,000 shares at the offering price. Whether it was a purchase or an underwriting seems unimportant in comparison with the purpose and the results of the transaction.

A study of the conditions of the Seaboard Railroad leads to the conclusion that by reason of its capital structure, fixed obligations, earnings record, credit limitations, and the physical condition of its properties, it was, as to common stockholders, generally unsound as an investment. The plan of reorganization which involved the issuance of the common stock, was intended to effect an improvement in its current position and capital structure by the retirement of certain prior obligations and the furnishing of funds to enable it to continue and to increase its operations. From a close analysis of the earnings and the probable effect of the refinancing, it would appear that the hoped for results were in no sense reasonably certain of accomplishment. Most of the additional capital was required to meet maturing indebtedness, leaving an insufficient amount to assure continued operation and the expected increase of gross revenues; and the position of the common stockholders would not be substantially improved.

The stock market transactions in Seaboard provided no sound basis for measuring the value of the stock or its future prospects. Prior to the reorganization the outstanding common consisted of 371,000 shares some of which were sold on the exchange in the 11 weeks prior to the underwriting at from 19⅝ high to 12½ low. This stock, however, was essentially different in its position from the new and larger amount of common stock involved in the refinancing, and it may not be accepted as a guide to the value of the new common. Under these circumstances and in view of the fact that the Seaboard continued its decline to an ultimate receivership in December 1930, it seems impossible to find any value, other than a wholly speculative one, in the Seaboard common at the time of its acquisition.

It is clear that the Pennroad's purchase of Seaboard could not have been prompted by a belief that the market prices indicated sound values or glowing prospects, or by the earnings of the company, past or prospective. It is quite unlikely that Pennroad undertook the underwriting obligation merely for the possible commission it might earn, and we must therefore assume that the purchase was made with the view to sharing in the anticipated prosperity of the southern railroads, and more particularly the traffic in the area traversed by the Seaboard. But from the circumstances it is also apparent that the benefit expected to be derived would not inure primarily to the Pennroad.

Penna. Railroad had been first approached by the promoters of the refinancing plan with the view to having large railroad interests participate in and lend strength to the venture. The railroad, however, declined to participate unless other southern

railroads connecting with the Penna. were consulted, and the matter was referred to Pennroad. A commitment was made by Pennroad to acquire the stock and was followed by the formation of the underwriting syndicate. About the same time and at the instance of the Penna. Railroad, Pennroad also invested $1,250,000.00 in the southern and the Atlantic coast line railroads with the view to having the Penna. Railroad establish relations "with all of those companies and to share the prosperity of the south". The testimony as more fully reviewed in the opinion filed, quite adequately indicates that the Pennroad purchase of Seaboard was essentially in the interests of the Penna. Railroad, and was made with the object of forming a closer ownership or operating alliance with the Penna. Railroad by means of the friendly stock ownership of the Pennroad. It was to be expected that with Pennroad's investments in the southern Atlantic and Seaboard lines, a friendly and cooperative relationship would exist between those railroads and the Penna. and that the latter would thereby benefit from the expected increase of southern railroad traffic. This we deem, in the absence of any sound prospects of other profits, to have been the motive and influence which prompted the purchase.

Pennroad thereby assumed the whole risk of the venture at the instance and for the benefit of the Penna. Railroad, with little or no chance of profit to itself. The value of the stock was speculative or prospective at best, and there appeared to be no present means of determining with any degree of accuracy the real value of the stock at the time of its purchase. It therefore seems just and equitable that the risk and therefore the loss should follow the benefit, either actual or intended, and that Penna. Railroad be charged with the whole of the provable loss resulting from this investment.

Under the underwriting arrangement Pennroad acquired 402,119 shares of Seaboard at a total cost of $4,523,838.75. There being no justification for finding that such purchase was even a reasonably sound investment made voluntarily by Pennroad for its own purpose, we conclude that it was made under the domination and at the instance of the Railroad in accordance with the general scheme and purpose previously described, and that the whole of the purchase price must be charged to the defendant as one element in the measurement of

its total financial liability. The amount, however, must be reduced by the sum received by Pennroad's sale of Seaboard stock, to wit, $73,686.71, and the net charge to the defendant is therefore $4,450,152.04.

Pennroad's purchases of New York, New Haven & Hartford consisted of 148,800 shares of common at an average price of $116.27 and 1,200 of preferred. The purchases were made on the New York stock exchange through Kuhn, Loeb & Co. between July 1929 and June 1930. Penna. Railroad was also purchasing similar stock and, being the dominating influence in Pennroad, was instrumental in causing Pennroad to make the purchases in the interest of extending the influence of Penna. in the New England railroad field.

By reason thereof the complainants contend that the burden of establishing the soundness of the investment and the propriety of the prices is upon the defendant, that the price was kept up by such large purchases beyond its investment value, and that Pennroad was not justified in making so large an investment in an inherently speculative stock. It may be noted here that the purchase of New York, New Haven & Hartford securities did not come within the restrictions imposed by the Transportation Act and Interstate Commerce Commission, and the general language of the opinion with regard to such restrictions was not intended to apply to this and other purchases of the same character.

The experts' report gives a full account of the market transactions in New York, New Haven & Hartford during the period in question, the dates and prices of Pennroad purchases, and of the activity of Penna. in the same market. They noted that the transactions do not indicate an eagerness to buy which pushed the prices to or beyond the prices which other purchasers were willing to pay, that advantage had been taken of the changing market, and that the volume and frequency of transactions in New Haven established a fair market value, uninfluenced by any special considerations. New Haven stock did not act substantially different from the pattern of the rest of the rail market and followed closely the Dow Jones Railroad Stock Averages. They said, "In our opinion the loss suffered by Pennroad on its purchases of New Haven securities was not due to the purchases at excessive prices * * * but resulted from the general changes which subsequently took place."

This transaction differs from D. T. I., P. & W. Va. and Canton in that it was a purchase of securities of a successful railroad on the open market, and not a privately negotiated purchase of the whole or the controlling interest in a strategic property. Although made in pursuance of the Penna. Railroad's general plan as previously described, the purchase was an actual investment by which Pennroad might hope to benefit from income or profit. Stockholders of Pennroad who also held stock of Penna. Railroad could also anticipate an indirect benefit, if the railroad's influence, thus expanded, produced the desired results. All of this was in line with the announced objectives and accepted design of Pennroad's promotion, and the problem resolves itself into whether or not an excessive price was paid.

■ The experts have chosen the actual market as the most accurate means of determining the value of New Haven securities at the time of Pennroad's purchase. They point out that such market establishes in this case what willing buyers paid and willing sellers accepted and that the prices reflected the general opinion and esteem in which New Haven was held. It is quite possible that a structure and earnings analysis as suggested by the complainants, and as more properly applied to Seaboard, would show an entirely different technical valuation. We are not disposed, however, to say that the judgment of the experts is not the best under these circumstances, or that the actual stock market record does not with reasonable accuracy establish the standard of investment to which the Pennroad directors should be held in this instance. The Chancellor holds that no liability should be imposed upon the defendant by reason of the New Haven purchases.

Pennroad acquired its Boston and Maine holdings through an investment banker under an agreement which fixed the amounts to be paid on dollar prices or on a yield basis. The banker was to make what he could when upset prices were specified but final compensation was to be adjusted to $5.00 per share. By this means Pennroad bought 201,387 shares and invested $23,- 617,708.38 in Boston and Maine securities at prices of $130.00 as to common and prior preference stock, $110.00 for preferred and on a yield basis of 5¼ to 5½% for the lettered preferred issues, which prices do not form a basis for market comparison. The experts report that the arrangement and the account with the banker precluded exact determination of costs as to particular transactions; some purchases were at market price, and others, particularly of closely held preferreds, were accomplished through negotiations.

The report of the experts gives a comprehensive analysis of the history and financial set-up of Boston and Maine, its operating experience, reorganization of its financial structure, and of its earning capacity. The carefully prepared tables, the comparisons made, and the description of investment standards given in the report leave no doubt that the experts have conscientiously endeavored to establish a logical basis for measuring the loss and the degree of liability to be imposed. They conclude that an average range of $110.00 to $115.00, or a median of 112½, for the common stocks purchased at $130.00 would give "appropriate recognition to all the factors which in the light of the Chancellor's opinion we deem should be given consideration by us"; that "approximate justice would be done by reimbursing Pennroad in a sum equal to that by which the charged cost on any purchase (of lettered preferreds) exceeded 5⅝%"; and that purchases during the period July to December, 1929 of Old Preferred "reflected an added price for their voting privilege and that the cost thereof to Pennroad should be adjusted downward to not exceeding par". The Prior Preference shares were found to have been purchased within a reasonable price range and no charge to the defendant was recommended.

■ Both parties have argued that the conclusions of the experts are unsupported by a proper analysis of the circumstances or by accurate calculations, and they take exception to the reasoning and explanations given in the report. If the findings were based solely upon the figures and schedules discussed, it is quite possible that some fault could be found with the method. But, as stated before, the experts were charged with the duty of suggesting to the Court what in their combined opinion they deemed to be a fair measure of the liability, without fixing or depending upon an exact standard or mathematical calculation. Where there is an honest difference of opinion, either of values or methods, we think the opinion of the experts should be accepted as a guide. The liability is necessarily expressed in dollar figures, but the judgment exercised in arriving at the amounts has undoubtedly been prompted by an appreciation of the whole problem and

the relative rights of the parties. The Chancellor holds that the aggregate charge to the defendant by reason of Pennroad investments in Boston and Maine be fixed at $1,271,983.88.

The Lehigh Valley transaction concerns the purchase of 10,000 shares of common stock from New York brokers at $65.00. The investment was comparatively small and was below the market price. The complainants maintained that the Penna.'s policy and domination caused Pennroad to make the investment and that company should be charged with the loss. The experts have not so recommended, and in the absence of further protest by the complainants, we find it unnecessary to further discuss it, and decline to charge the defendants on this item.

The investment experts were not called upon to measure that portion of the defendant's financial liability which arises out of the National Freight venture. It has been found that the National Freight was an agent or subsidiary of the Penna. Railroad and that its formation and operation constituted a flagrant violation of the defendant's fiduciary duty. The sole beneficiary was the Railroad, and it profited substantially from the added freight revenue, the rentals, and competitive advantages. Any and all net profit from National Freight traffic must therefore inure to Pennroad in accordance with the finding that "the Railroad is not entitled to any benefit whatever as against Pennroad". The defendant was directed to state an account of receipts and disbursements and to remit to Pennroad all net profits arising out of the operation of National Freight, as a fair measure of the damages for which the defendant may be equitably charged.

In pursuance thereof, a "Statement of Account Receipt and Partial Approximate Costs, National Freight Traffic, October 16, 1929 to March 1, 1933" was filed by the defendant. The statement was prepared under the direction of F. J. Fell, Jr., vice president and comptroller, who appeared for examination and made a full explanation, of his methods and the reasons for his conclusions. The statement showed that the gross revenue to Penna. Railroad from National Freight traffic was $5,784,958.00 and from rentals $198,224.00 making total revenue of $5,983,182.00. Mr. Fell declared that because of the nature of railroad costs which are largely made up of common or general items it is as a practical matter impossible to state definitely and accurately the costs involved in handling National Freight traffic. The statement consisted of the figures and calculations of the net profit on four different bases, all of which included in the costs, taxes, fixed charges and general overhead expenses not directly assignable to specific classes of traffic or business. Mr. Fell favored Method A which showed a total net profit of $182,487.00, or Method B showing a profit of $522,930.00, or an average of the four methods given, as a fair estimate of the net profit earned. It is unimportant to review these various methods until it is determined whether or not any part of the general railroad operating and fixed charges are to be deemed a part of the costs of National Freight traffic.

If it be decided that the general charges are to be taken into account, then a selection may be made of the suggested methods of estimating net profit. But if these items are to be substantially eliminated, then all of the defendant's calculations must be discarded and an alternative method adopted which will include only those items of costs which are directly chargeable to the traffic in question or which will take into account only a nominal portion of the general or common expenses.

The defendant maintains that net profit means the proportion of money received which remains for the use of the owner after all expenses are paid, and that those expenses must include taxes, fixed charges, and other items common to the whole enterprise. This principle as to expenses has been recognized in cases involving the fixing of rates for particular commodities or classes of traffic (Northern Pacific Railway v. State of North Dakota, 236 U.S. 585, 35 S.Ct. 429, 59 L.Ed. 735, L.R.A.1917F, 1148, Ann.Cas.1916A, 1) in the interest of avoiding the possible preferences which might result if only out of pocket costs were charged to particular commodities or shippers. Such rule is not necessarily applicable to the present case and we do not feel compelled to adopt it.

Generally a fiduciary may charge off his actual costs and expenses against gross profits; and in normal accounting all revenue must bear its proportionate share of the expenses attributable to the whole transaction or enterprise. Where, however, the revenue is received in breach of the trust, such revenue is income to which the fiduciary is not entitled, and it may therefore not be treated as part of the earnings

of the enterprise. A fiduciary may not benefit from a breach of his trust. If Penna. Railroad were permitted to charge against the gross income thus wrongfully obtained, a portion of the general system expense, which it would have to pay in any event, it would thus be casting upon National Freight revenue a part of its own burden, and thereby benefitting itself to that extent. This may not be permitted to any appreciable extent in view of the finding that Penna. Railroad shall receive no benefit from the National Freight venture.

The defendant has contended that the National Freight is a separate and independent entity and not a part of the railroad enterprise. It has been found, however, that it was an agency or instrumentality of the defendant railroad. Such finding did not imply that any part of the railroad's general expense should be charged to the business of the National Freight, nor was it intended that Penna. Railroad should in its accounting of National Freight earnings obtain any indirect benefit by charging a material portion of its general overhead to that venture. Net profit was intended to mean the net increment to Penna. Railroad from the National Freight traffic, the difference between receipts and the out of pocket costs incident to that business; and not the net benefit to Penna. Railroad which might be enjoyed after deducting from net revenues any appreciable portion of the charges for wharves, stockyards, stations and the innumerable items of expense incident to the operation of a large railroad system.

■ We decline to charge the revenue from the National Freight traffic with that part of the overhead or general expenses of the Penna. Railroad involved in the statement submitted, and must therefore adopt a method, other than those suggested by the defendant, for calculating the net profit received by the defendant from the National Freight traffic.

Although no method has yet been devised for determining the exact cost of the various types of traffic, approximations having a reasonable bases have been used in many instances by public authorities and railroad accountants for the purpose of determining operating costs. Reasonably accurate approximations can be obtained by measuring costs upon a ton mile basis, the unit of measurement being the transportation of one ton of freight one mile. Formulas have been developed using net ton miles, reflecting the weight of the lading, and gross ton miles reflecting the weight of the lading and the car. Using such formulae and the operating statements furnished by the defendant, it is found that the average revenue per ton mile for National Freight traffic was 55% higher than that of the entire system traffic, due to the fact that the forwarder freight consists of the higher rate and more profitable classes.

National Freight loaded car miles were shown in the statement to be 23,354,463, and averaged 15 tons per car as against 28 tons for the whole system. By multiplying the loaded car miles by the tons of lading gives the ton miles which were revenue producing and therefore designated as revenue ton miles; and dividing the revenue ton miles by the gross revenue gives the revenue per ton mile of 1.486 cents as compared to .958 cents for the entire system.

Comparing the total revenue ton miles of the National Freight traffic with those of the entire system, it is found that National Freight revenue ton miles is .3524 percent of the total system ton revenue miles. Total freight operating expenses of the entire system was reported to be 66.88 percent of the total operating expenses. Applying the ratio of National Freight revenue ton miles to the operating expenses, we may find the cost of the National Freight traffic, and by completing the calculation, it is shown that on the revenue ton mile basis the profit to Penna. Railroad on National Freight traffic was $3,306,845.00.

A somewhat similar process may be used to determine the gross ton miles and the ratio of National Freight gross ton miles to the total for the Penna. system. The National Freight average loading was 15 tons and the average car weight 20 tons, making an average gross weight per car of 35 tons. National Freight's gross ton miles is found by multiplying its loaded car miles by 35, and by comparing this with the system gross ton miles, it is found that the National Freight's ratio is .3304131 percent. Using this ratio on the freight operating expense for the system, finding the National Freight's share of costs, and deducting it from the gross revenue will give the net profit; and by this method the net profit to the Penna. Railroad is shown to be $3,473,656.00.

These methods result in the National Freight bearing a proportionate share of all freight operating expenses and of gen-

eral expenses, but in view of the fact that the revenue from National Freight was about ½ of 1 percent of the system total and that by this method, such share is relatively negligible, no objection may be made to the calculation of operating costs on either the revenue ton mile or the gross ton mile bases as described.

In view of the fact that both methods are similar and produce almost the same result, they may be deemed equally acceptable. However, in the interest of recognizing the merits of both and of avoiding the necessity of choosing one over the other, we think it is wise to take the average of the two and fix the profit to Penna. Railroad arising out of the National Freight venture at $3,390,250.00.

Although differing materially from the methods suggested by Mr. Fell, this result substantially conforms to the opinion of Mr. Deasey that the test of whether a profit is produced by an integral part of an operation, is a comparison of the revenues received from that operation, with the expenditures which could be eliminated if the operation were stopped. He estimated that about 50% of gross income from the freight forwarding business could be converted into net income, the net income depending upon unit costs which are largely controlled by volume. Mr. Lee also estimated that the net profit on National Freight traffic was about 50%.

It is felt that the measure of financial liability thus fixed is founded upon reasonably sound methods of determining approximate costs and that the result in fact fairly and equitably measures the financial burden which must be imposed upon the defendant.

The defendant contends that the damages, if any are awarded, should be limited to those persons who were Pennroad stockholders at the time of the transactions or to whom such stock thereafter devolved by operation of law; and that the total damages which might otherwise be awarded should be proportionately reduced so as to bar recovery by all persons not so qualified. Reliance is placed principally on Home Fire Ins. Co. v. Barber, 1903, 67 Neb. 644, 93 N.W. 1024, 60 L.R.A. 927, 108 Am.St.Rep. 716 as authority for the proposition that a purchaser of stock cannot complain of the prior acts and management of the corporation, and if the stockholders have no standing in an equity proceeding, the corporation will not be permitted to recover.

That case has been distinguished as to facts and law by the same very able authority who prepared the opinion itself, and by counsel who appeared for other parties, and we do not deem it controlling. There is ample authority for the rule that in a derivative action brought on behalf of a corporation, the complaint and defenses are to be considered as though the corporation itself were suing. The benefit of a derivative action brought on behalf of the corporation necessarily results to all shareholders equally, even though some of them may have been precluded from bringing action on their own behalf. To permit the recovery to be diminished in proportion to the holdings of such stockholders would be to transform the derivative action into one for the benefit of individuals and not of the corporation. The theory of the action must be recognized and the whole recoverable amount must be paid to the corporation notwithstanding the individual standing of particular stockholders. Keenan v. Eshelman, 1938, Del., 2 A.2d 904, 120 A.L.R. 227, affirming 22 Del.Ch. 82, 194 A. 40. The substantive law of Delaware, domicile of Pennroad, determines the rights of the stockholders of Pennroad to participate in its internal affairs and the assets it might acquire through litigation or otherwise. Gallup v. Caldwell, 3 Cir., 1941, 120 F.2d 90. Procedural Rule 23 (b), 28 U.S.C.A. following section 723c, relating to the right of stockholders to bring derivative actions on behalf of the corporation and other stockholders does not abridge, enlarge, or modify the substantive rights of any litigant (Act 19 June, 1934, 28 U.S.C.A. § 723 b) nor may it be construed to abridge, modify or otherwise limit the rights of the corporation or stockholder beneficiaries in a derivative action. The damages awarded may therefore not be diminished by the proportion of the stockholders who were not such at the time of the transactions in question.

In the light of these principles, we are urged to further consider the application of A. G. Costello, Succeeding Trustee under deed of Peter E. Costello, to intervene as a party plaintiff. The problem as originally presented involved questions as to whether Costello as Trustee acquired his holdings of voting trust certificates by operation of law, and whether under Rule 23(b) he would be precluded from intervening because of the assignment of the certificates to him after the dates of the Pennroad transactions in question. It is clear that

procedural rule 23 (b) must in this case be confined to the original complainants and, in view of the finding that the rights of stockholders must be determined under the law of Delaware, and such law recognizes the rights of all stockholders to participate, we conclude that the Trustee's application to intervene should be granted. An order may be entered accordingly.

■ Defendant argues further that the amount of the award of damages attributable to improper investments should be set off by the amount of the estimated benefit derived from those investments which appear to have been profitable. Such theory disregards the fact that the present proceeding was brought to charge the defendant with a breach of duty in regard to all of the investments, and to fix the equitable damages either on a basis of the total cost or in a lesser amount if such would fairly measure the respective equities. Any benefit resulting to Pennroad from particular investments was only what it was entitled to, and the defendant may not claim a money credit for the estimated advantages enjoyed by Pennroad in spite of the breach of trust. We therefore decline to recognize any set-off to the defendant against the amount of the damages herein found.

■ The complainants have asked that interest be allowed upon the damages awarded from the dates of the respective investments, at the rate of 4%. Presumably the request does not include the National Freight in view of the previous statement that the accounting of profits should be in lieu of interest. The authorities quite generally recognize that the allowance of interest in a suit at equity is within the court's discretion and many cases have been found refusing to allow interest where the injury did not result from fraud or conversion but was due to some lesser default or breach of duty. Insuran-Shares Corp. v. Northern Fiscal Corp., D.C., 42 F.Supp. 126. In view of all of the circumstances and of the measurement of the financial liability of the defendant previously discussed, we decline to include as part of the damages any interest thereon.

The complainants petitioned for a review of the findings of fact and conclusions of law previously made, and for leave to submit additional requests, which was granted. They have suggested modifications of the findings and presented requests intended to cover additional matters concerning the measurement of the defendant's liability. Defendant and the intervenors have also submitted additional requests.

At the close of the trial several hundred requests were presented and were ruled upon in the light of the discussions and comments contained in the opinion. Due to their great number and complexity, they were classed and disposed of in a manner intended to be consistent with the opinion and to answer each particular request for the purposes of the record. It was intimated, however, that because of the great number of facts and of the differences in the views of the parties, confusion might exist due to the language used and the variance in the impressions of the Court and the respective counsel. Minor errors in classification and expressions have also been suggested which will be corrected.

The requests for modifications and additional findings demonstrate the limitations, and at the same time the flexibility of verbal expressions as used by different persons intending to convey the same or similar thoughts. In view of the extended discussion of conclusions in the opinion, it was hoped that words having a technical meaning might be understood with the moderation implied by the general nature of the findings, and we assume that there is no substantial difference in the understanding of any of the parties as to what was actually intended by the specific rulings. The present requests, although concise, also involve technical language, and the rulings thereon must be accepted with an appreciation of the tenor of the previous discussions.

Denial of Penna.'s fact request 161 was prompted by the impression that it involved a conclusion of law, and it is not inconsistent with the affirmance of law request 41 which was intended to deny the existence of a common conspiracy in the accepted sense of that term. The rulings on Penna. law requests 20 and 22 are not necessarily in conflict in that 22 involves the propriety of the "conducting" of the forwarding business by Pennroad and was affirmed, whereas 20 holds that the "engagement" of Pennroad in that business on behalf of Penna. was improper. Pennsylvania law requests 31, 34, 37, 40 (and 43 inadvertently omitted) were affirmed in the abstract sense that there was no fraud by Pennroad in the purchase of the various stocks. The ruling did not imply, however, that the particular purchases were not prompted by Penna. in breach of its fiduciary obligation. Requests 25 and 28 refused, are changed to

affirmed to conform to the rulings on the similar requests.

Penna. fact findings 146, 195, 201 affirmed as to factual substance are, in the interest of consistency, denied. All of these involve the question as to whether Pennroad directors acted for the best interests of their company. In the sense that they acted to serve Penna. under the general plan, and in doing so, they thought they would best serve their own company, the requests should be affirmed. It seems more accurate, however, to find that in so doing they could not have given proper consideration to the question as to which company would be best served. Fact request 139 is changed from affirmed to denied to conform with the rulings on 89, 102, 124, 154, 170 and 190 all of which have to do with the profit to Penna. Railroad from Pennroad's investments. It seems proper to conclude that Penna. Railroad did profit to the extent that its purpose was accomplished, and for like reasons fact request 140 is changed from substantially affirmed to refused. The ruling on fact requests 145 and 159 is changed to refused. There appears to be justification for distinguishing the various investments and their prospects. Modification of rulings on other Penna. requests are refused.

The complainants' requests for findings and conclusions as modified, with the view to covering the additional matters developed to measure liability, are disposed of as follows: B-29, B-30, B-33, D-18, E-11,a, E-11,b, E-13, F-15, G-25,a, G-25,b, G-28, G-33,a, G-33,b, G-34,a,b,c, G-37, H-8,a,b, and H-9 are refused. D-13,a, D-13,b, F-11,a, F-11,b, G-23, G-33,c, and G-33,d, are affirmed. Those requests for findings as to excess costs which differ from the findings as to liability as above discussed are denied as not being in conformity with the facts developed. Those which refer to a premeditated and preconcerted scheme are not adopted because it is believed that the language of the Court's opinion and findings more adequately describes the plan and purpose of the formation and operation of Pennroad, although that purpose was to use the funds and corporate powers for the benefit and advantage of the railroad. Other requests are not deemed essential to the issue, are adequately covered by other findings, or call for the measuring of the knowledge and information available to the directors, and are refused.

The words "other purchasers" in the 19th line, page 23 of the opinion are stricken out, and "Penna. Railroad" substituted, in conformity with the facts.

Penna. Railroad's requests for additional findings of fact Nos. 208, 209, 210, 214, 215, 227, 231, 235, 236, 237, 238, 239, 245, 247, 248, 255, 257, 258, 259, 260, 262, 264, 265, 270, 271, 272, 275, 277, and 278 and for additional conclusions of law Nos. 54, 56, 58, 60 and 63 are affirmed. All others are refused as being in conflict with the facts or previous findings, or because they call for opinions, comparisons, suppositions, estimates or determination of causes and effects. These are not deemed essential or within the duty of the Court to decide.

Requests for findings of fact and conclusions of law submitted by Frieda S. Kaufmann and Patrick Connor as follows: fact number 2, 3, 5, 7, 8, 9, 11, 12, ·13, 16, 18, 19, 20, 21, 23, 24, 25, 26, 27, 28, 29, 30, 31, 34, 36, 38, 39, 40, 41, 43, 44, 45, 49, 50, 51, 52, 53, 55, 56, 57, 64, 65, 67, 68 to 84, conclusions Nos. 3, 9, 15, 24 and the modifications of the Court's fact finding 12 and law conclusion 3 as suggested are adopted. All other requests are refused because the Court declines to accept the exact wording of the request; the terms "solely" and "only" in many cases too rigidly limit the possibilities, the suggestion as to what "would have" occurred or resulted calls for certain anticipations not necessary to express, others involve comparisons or determinations of matters not essential to the issues, the term "unauthorized" has been used in both a technical and general sense which might result in misinterpretation, and other requests are contrary to the findings and conclusions or are at variance with or are repetitious of other findings and comments. In view of the extensive coverage of all points, it is not deemed necessary to further specify the grounds of refusal.

The Chancellor has undertaken to dispose of this phase of the case with a full appreciation of the great responsibility placed upon him. The measuring of equitable redress to be granted is a tremendous burden where facts and circumstances are complex and a wide difference of opinion is possible. The problem has been approached with the purpose of recognizing that each of the parties must bear some portion of the responsibility for the situation in which they find themselves and that the aggregate financial liability must represent the rela-

tive share of the culpability as nearly as it can be measured in dollars.

The awards specified, although based to some extent upon mathematical calculations and upon facts and figures which are capable of exact measurement or comparison, are intended to represent that measurable portion of the capital losses for which reimbursement to Pennroad shall be made, or the degree of financial responsibility to be imposed upon the defendant because of the breach of its fiduciary duty. The final result is, in the mind and conscience of the Chancellor, a fair and equitable disposition of the principal issues, the liability of the defendant, and of the many related problems.

Counsel may submit forms of decrees to be entered in conformity herewith.