**In re LONG ISLAND R. CO.**

No. 47970.

United States District Court
E. D. New York.

April 11, 1950.

See also D.C., 83 F.Supp. 974.

Cullen & Dykman, Brooklyn, N. Y., for the trustees (Jackson A. Dykman, Brooklyn, N. Y., of counsel), for the motion.

Marcus G. Christ, Mineola, N. Y., for Nassau County (Orrin G. Judd, New York City, of counsel), in opposition.

KENNEDY, District Judge.

On September 8, 1949 the trustees applied for permission to retain as consulting engineers the firm of Coverdale & Colpitts (hereinafter referred to as Coverdale, or the Coverdale firm). The petition was opposed by the County of Nassau, the matter was argued and decision was reserved. Thereafter the County of Nassau asked me to take no action, and to delay decision until certain proceedings which it contemplated taking before the Interstate Commerce Commission had been perfected and concluded, proceedings which I am about to describe briefly.

In March 1949, after the filing of the petition to reorganize the railroad, I appointed three trustees. One of them (Smucker) was the person then in charge of the operations of the railroad as General Manager. Although a former employee of the Pennsylvania Railroad (the principal creditor), Smucker's comparatively brief tenure as General Manager of the Long Island Railroad had prompted the Public Service Commission to praise, in an official document, the improvements in service brought about during his administration. The other trustees named had no connection whatever with the Pennsylvania Railroad, were Long Island residents, and, on the basis solely of my personal knowledge of their character and competence, I believed them fully qualified to discharge the onerous duties I sought to place upon them. I say onerous, because the reorganization of the Long Island Railroad, a task complicated and of the greatest importance in itself, has been and is further complicated by criticism of the part played by Pennsylvania Railroad as a stockholder and creditor, and by a long history of intercorporate relationships between the two companies.

The Interstate Commerce Commission in part refused to confirm the appointments I made. On grounds of economy, the Com-

mission decided (April 5, 1949) that no more than two trustees were necessary. It ratified the appointment of Smucker and of one of the "public trustees"; it refused to ratify the third nomination. On September 22, 1949 the County of Nassau applied for rehearing. During the pendency of this application, counsel for Nassau asked for delay in the Coverdale proceeding on what I thought were highly reasonable grounds: that if the Interstate Commerce Commission should reverse itself, and approve the appointment of a third trustee, then all three should unite in the selection of a consulting engineer. I, therefore, granted the application of Nassau. But it was not until December 29, 1949 that the Interstate Commerce Commission decided the matter: it rejected the contentions of Nassau County, and specifically dealing with the case of Smucker, pointed out that his former connection with the Pennsylvania Railroad was no obstacle to his appointment.

By this time I had reached the conclusion that a hearing should be held on the question of the appointment of the Coverdale firm, largely because the papers in the case had become voluminous, and I thought that oral proof might produce a clarification of the issues. During January I consulted with counsel; after preliminary discussions it was found that the earliest date convenient for the holding of hearings would be toward the end of February. At about this time the trustees applied for a six-month extension of time to disaffirm contracts, the statutory period as extended being about to expire (March 2, 1950). The County of Nassau urged me to deny the application altogether at first, but then receded from this position and suggested

that I grant the application only on condition that the trustees immediately disaffirm certain contracts between Pennsylvania and Long Island, although it was clear beyond argument that any intelligent action in this regard on the part of the trustees would require an examination into the facts by competent consulting engineers, and although appointment of the firm suggested by the trustees (Coverdale) had been delayed at the request of Nassau itself. I felt that this position was unreasonable and I extended the time of the trustees to file a plan until September 2, 1950.

It is necessary for me to digress at this point for the moment and to say that constructive and affirmative action looking toward the reorganization of the railroad is, in my opinion, vital. But more than that, it is just as essential that such action shall be taken as speedily as circumstances permit. The delay in the selection of engineers between September 8th and the present is no one's fault, although inevitably the public will mistakenly charge it to the trustees. I mention this matter because it is and has been to me of paramount importance that needless bickering should not interfere with what I consider ought to be the prime concern of everyone connected with the reorganization: speedy solution of problems that affect the welfare of Long Island as a community and practically every individual in it.

I turn now to the objection of Nassau to the granting of the petition authorizing the retainer of the Coverdale firm. In their main brief submitted after the hearings counsel for Nassau took the position that there were six reasons why the Coverdale firm should not be appointed. I set these forth in the margin.[1] I shall for brevity

---

1. "1. Personal employment by and acquaintance with Pennsylvania and New Haven (Specifications Nos. 1 and 15).

    "2. Business relations with Pennsylvania (Securities Syndicate, Seaboard Air Line and Richmond-Washington Co.).

    "3. Early services for Pennsylvania and companies in which Pennsylvania was interested (Specifications Nos. 4, 8, 9, 10, 11, 12 and 13).

    "4. Centennial History of Pennsylvania Railroad (Specifications Nos. 5 and 6).

"5. Services for New Haven in relation to compensation for use of Long Island's Bay Ridge Division (Specification No. 2).

"6. Other services for New Haven (Specification No. 15)."

Two other heads of discussion contained in Nassau brief are:

"7. The claim that services adverse to Pennsylvania, for New Haven and others, should remove any disqualification.

refer to them as the claims of Nassau, and shall designate them by the numbers set opposite them in the portion of their brief which I have quoted. Claims 7 and 8 are obviously more argumentative than factual and proceed on the assumed basis that a "disqualification" has been established, so that discussion concerning them can be postponed. Claims Nos. 3 and 6 are of such remote character that even their relevancy is doubtful, as I tried to point out to counsel for Nassau. There is a discussion in the record on this point, and speaking of these claims (3 and 6) or at least of the bulk of the "specifications" to which they relate, counsel for Nassau said that they were "cumulative" and "simply add a little to the whole picture of the connection * * *".

The real issues therefore, as I read the record, boil down to the following contentions on the part of Nassau: (1) that the Coverdale firm should not be employed because many years ago four of the eight partners were employed either by Pennsylvania or by the New Haven Railroad (New Haven), (Claim 1); (2) that the Coverdale firm should not be retained because it had business relations with Pennsylvania (Securities Syndicate, Seaboard Air Line and Richmond-Washington Co.), (Claim 2); (3) that the Coverdale firm should not be retained because it was engaged by Pennsylvania to compile, and one of the partners, assisted by another, wrote a centennial history of the Pennsylvania Railroad, (Claim 4); (4) that the Coverdale firm should not be retained because it rendered services for New Haven in relation to compensation for the use of Long Island's Bay Ridge Division, (Claim 5).

1.

Personal Employment

There are eight partners in the Coverdale firm. One of them (George H. Burgess) was employed by Pennsylvania between 1896 and 1905 as a rodman and later as an assistant engineer. A second partner (Kennedy) [2] was employed by Pennsyl-

vania between 1922 and 1927 as a draftsman. A third partner (Slater) was employed by New Haven between 1914 and 1925, originally as a statistician and finally as assistant to the general manager. A fourth partner (Gordon) was employed by New Haven 20 years ago (1916–1930) in the accounting and operating departments. None of the other four partners has ever been employed by either railroad.

I suggest that there is probably no firm of consulting engineers in the country whose partners, in practically every case, have not begun their careers as railroad employees. To say that these persons, to say nothing of the firms of which they form part, are therefore "disqualified" to investigate the railroads in question is, in my opinion, an utter absurdity. Such facts have no relevance either standing by themselves or in connection with other claims of "disqualification".

2.

Business Relations.

In 1928 the Coverdale firm managed a securities syndicate organized to acquire Seaboard Air Line Railway Co. Pennsylvania was at that time competing with another railroad in the purchase of Seaboard securities. The Coverdale firm rendered a report to its client, Seaboard, forecasting the need for further financing. Thereafter Pennroad, a subsidiary of Pennsylvania, purchased a portion of the Seaboard interest acquired by Seaboard Syndicate. Unfortunately for everybody the plans to refinance Seaboard with Pennsylvania participation culminated into an agreement only a few weeks before the crash of 1929, and no public offering of the securities could be made (because of delay in approval by the Interstate Commerce Commission) until well after the crash. As a result, some years later (1941) the stockholders of Pennroad began an action against Pennsylvania (Overfield v. Pennroad Corporation et al., D.C.E.D.Pa.1943, 48 F.Supp. 1008) which resulted (1943) in a district court judgment against the direc-

"8. The claim that engineers are merely fact finders, and therefore are necessarily free of disqualification."

2. This man is not related to me.

tors of Pennsylvania. This judgment was reversed, not on the merits but on the ground that the statute of limitations had expired. 3 Cir., 1944, 146 F.2d 889. But speaking for the third circuit court, Judge Goodrich discusses the findings of the trial court, and also certain statements in the nature of findings. 3 Cir., 146 F.2d 889, 892, 893. At the end of that discussion Judge Goodrich says that as far as the Pennsylvania directors are concerned "moral fraud is thus clearly eliminated".

At the trial of the Overfield case Mr. Colpitts, a member of the firm being considered for retention, testified in behalf of Pennsylvania concerning the Seaboard transaction. Ultimately the claims of Pennroad against Pennsylvania were settled by the latter's paying the sum of $15,-000,000.

I know it will be wondered at this point what possible connection this litigation can have with the proceeding at bar. But I have set forth the facts, perhaps in greater detail than might be warranted, since it is from this tangle that counsel for Nassau would have the conclusion drawn that the Coverdale firm is disqualified. The facts are, in summary: (1) that 21 years ago the firm participated in the purchase of securities of its client, Seaboard; (2) that Pennsylvania and Pennroad (considered as an entity), acting at arm's length *vis a vis* Seaboard and the Syndicate, made a purchase, prior to the crash, of those same securities or part of them, a purchase which turned out to be unfortunate, probably for everyone; (3) that in a subsequent litigation really between Pennsylvania and its subsidiary Pennroad, a litigation in which Seaboard was in no way involved as a party, a district judge entered a decree against the Pennsylvania and its directors

(but not on the ground of any moral fraud); and (4) that Pennsylvania subsequently settled the dispute by the payment of a substantial amount of money. It is true that one of the partners of the Coverdale firm was called as a witness in that litigation on behalf of Pennsylvania, but throughout the business transaction his interest and the sole interest of the Coverdale firm, professional and otherwise, was in Seaboard.

The successive changes of position by Nassau County in its interpretation of these facts are interesting.

At the outset it was said in an affidavit that the firm hired by the trustees "should not be the same which was previously hired to defend the Pennsylvania Railroad against charges that it had mulcted another affiliate".[3] In the briefs submitted after the hearings Nassau County took the position that even though the Securities Syndicate and Pennroad Railroad ought to be regarded as *adverse* parties in the negotiation of the October 9, 1929 contract, yet the purpose and effect of the contract was to give the Pennsylvania an interest in the Seaboard similar to that of Coverdale & Colpitts, and its partners. In other words, the original charge that the Coverdale firm was retained to defend the Pennsylvania against a charge of mulcting its affiliate has now been watered down to a charge that the Coverdale firm became "partners" with the Pennsylvania in the ownership of Seaboard securities, as undoubtedly did thousands of others, and the theory now is that this 1929 "partnership" is sufficient to disqualify the Coverdale firm in any proceedings which might involve claims against the Pennsylvania.

But even more interesting is the following statement made at the hearings:

3. The direct basis for this charge was probably the fact that Colpitts testified at the Overfield trial. But even supposing that the Colpitts testimony was put forward to support the contention that the Seaboard transaction was conducted in good faith and in the honest belief that it would be successful, there is no suggestion either in the Overfield record or elsewhere that this was contrary to fact. The strongest proof of that lies in the substantial investment that the Coverdale firm itself made in the enterprise. And the dealings between Pennsylvania's directors and the Pennroad Corporation were matters in which the Coverdale firm played no part and had neither interest nor concern: that firm was interested in and acting for Seaboard, and Seaboard alone.

"Mr. Judd: Your Honor, I would like to make this statement before I go into the cross-examination of this witness:

"In reading the minutes of the opening day it seems to me that there has been a little confusion as to just what our position is. The County of Nassau is not attacking the integrity of the engineers or of the Trustees; we are not charging that it was improper for Coverdale & Colpitts to have been hired by the Pennsylvania Railroad * * *".

While the preceding quotation shows an interruption by the court, examination of the subsequent colloquy contains repeated statements by counsel for Nassau that he does not question the integrity of the Coverdale firm. This, it seems to me, is an admission that until the story of the "business relations" between the firm and the Pennsylvania was spread upon the record in the oral testimony, there was a complete misunderstanding by counsel for Nassau concerning the crucial fact that in the negotiations preceding the Seaboard transaction the Coverdale firm and its partners were interested in Seaboard and Seaboard alone, and that Seaboard's interest and that of the Syndicate were actually adverse to that of Pennroad and the Pennsylvania. The suggestion that the subsequent "partnership" is a disqualifying circumstance needs no comment.

### 3.

### The Centennial History of Pennsylvania Railroad.

In 1944 the Coverdale firm was retained by Pennsylvania to prepare a "Centennial History" of the road. This engagement continued until 1947, so far as actual work was concerned, although certain minor details necessitated sporadic services by the firm over some period subsequent to 1947. The bulk of the work was done by one of the partners (Kennedy) although another partner (Burgess) assisted in the compilation of data.

At this point it should be said that the Coverdale firm, as the papers show, has at one time or another been retained by practically every railroad in the country. But only twice since its organization (1904)

has the firm been retained by the Pennsylvania Railroad Company. One of those engagements was to furnish a report, including testimony in opposition to the construction of a navigable waterway between Lake Erie and the Ohio River. This engagement, while touched upon at the hearings, is scarcely mentioned in Nassau's brief. This leaves but a single engagement by Pennsylvania Railroad of the firm, to which counsel for Nassau now attributes significance, namely, the preparation of the history. And the interpretation placed on that engagement by Nassau is as follows: that chapter 71 of the history as finally compiled makes no mention of the *Overfield* litigation heretofore referred to, and that this omission indicates that the Coverdale firm is biased in favor of the Pennsylvania Railroad. The chapter in question carries the caption "The consolidation movement revives". The writer describes the efforts of various railroads to acquire others through consolidation. He concludes with a reference to the break in the market of October 1929 and the last paragraph but one begins with this sentence: "The application of hindsight, conditioned by the psychology of the depression, resulted in subsequent criticism of these purchases, which were made by Pennroad during the prosperous period of 1929 and early 1930." The writer then goes on to say that if Pennroad's directors are to be taken to task for failure to foresee the end of the prosperity of 1929 and the advent of the depression, then there must be taken to task with them practically all the recognized leaders in the government, business and financial circles of the time.

The partner who was chiefly responsible for the writing of the history testified at the hearings before me. He said in substance that he had no instructions to "whitewash" Pennsylvania, that his history was written from an engineering background with many subjects omitted, such as labor relations, public relations, competition, and litigation. Nevertheless, counsel for Nassau still sees something sinister in the failure of the historian to deal specifically with the *Overfield* litigation, calls the historian a "house" biographer who

necessarily tends to become partisan, and urges that this supposed bias and partnership infects the whole Coverdale firm. Stress is even placed on the fact that when the retainer of the firm was first discussed, Clement, a Pennsylvania officer, was staying at a hotel (Manoir Richelieu) which was owned by a corporation of which Coverdale (now deceased) individually was president.

I suppose the task of any historian or biographer is a difficult one: if he inserts and stresses material detrimental to the reputation of his subject he is inevitably accused of bias in one direction, and if he omits such material he is open to the charge of bias in another direction. But if, when engaged to write a centennial history of a railroad, from the point of view of engineering, the historian fails to furnish details about litigation, and to examine all of the charges made against the railroad by stockholders and others, it is much more reasonable to suppose that these omissions were dictated, not by bias, but by the scope of the work. And after hearing the evidence this was, to me, the only conclusion which the evidence permitted.

### 4.

### Services for New Haven in Relation to Compensation for Use of Long Island's Bay Ridge Division.

On May 23, 1939 Pensylvania and New Haven entered into what is called a "permanent and cooperative relation" with respect to the ownership and construction of a railroad known as the Connecting Railroad, which extends from a point on the Long Island Railroad near Fresh Pond Junction to a point on the New Haven system near Port Morris Junction. The Long Island Railroad owns and operates a line which extends from Fresh Pond Junction to 65th Street in Brooklyn at a place known as the Bay Ridge Yard. In other words, both Pennsylvania and New Haven have, over a considerable period, made use of the facilities of the debtor for the transportation of freight. Questions have arisen, and others no doubt will arise, concerning the fair division of revenue among the railroads involved, including the Long Island.

Prior to 1931 the situation with respect to the facilities mentioned was quite confused. There never had been a definitive agreement; there was merely a mass of correspondence and memoranda. New Haven, desiring to clarify the situation, retained the Coverdale firm to examine this material as a basis to determine if possible what form a definitive contract should take. Incidentally such a contract, with Long Island as a party, was arrived at on December 29, 1939, effective January 1, 1938.

The Coverdale firm entered upon the engagement (1931) which was conducted in very large part by one partner (Slater). As he put it, his job was to examine the record which the New Haven had and to tell that railroad what the record said. His reports did, it is true, contain what may be called suggestions, but these rested squarely on Slater's interpretation of the fundamental points of agreement in the past. This undertaking counsel for Nassau now interpret as one under which the Coverdale firm "advised" the New Haven concerning the terms of the existing arrangement, then in the process of clarification. But the record shows, even beyond quibble, that the firm, through Slater, was attempting simply to inform ("advise") the New Haven concerning past events, as a basis for a future position. It must be clear that in any litigation involving the disaffirmance of the present contract the Coverdale firm could not possibly be considered disqualified to furnish factual data simply because 19 years ago it became familiar with and reported on that portion of the pre-1931 transactions which was then reflected in the files of New Haven. It must also be clear that in this connection the firm is now apparently being charged with bias in favor of New Haven, whose interest was and is presumably *adverse* to that of Pennsylvania, the road in whose *favor* the Coverdale firm is said to be biased elsewhere in the record. The short answer to the charge is that familiarity with the pre-1931 situation would surely not pre-

clude an expert from giving an objective view of the post-1949 facts.

■ Under this head of controversy there was much discussion concerning the true role of a consulting engineer. The County of Nassau apparently takes the position (claim 8, footnote 1, *supra*) that the function of a consulting engineer in a reorganization is to tell the trustees what to do: in this instance, whether to disaffirm the contract, and, if so, on what grounds. I reject the notion that to sanction the appointment of consulting engineers is to appoint super-trustees. Perhaps the line between basic facts, inferences, and advice properly so-called is not always easy to draw. But trial counsel are required to draw this line in every case where they retain experts, and I have the greatest confidence that the trustees and their counsel are aware of the proper relationship between themselves and those who submit factual reports to them. Above all it should be kept in mind in this connection that the counsel for Nassau expressly disavow any imputation against the integrity of the Coverdale firm. This means to me that counsel also disavow any claim that the firm will distort or conceal facts. There is no factual basis whatever for the contention that the New Haven retainer of 1931 in any way disqualifies the Coverdale firm.

### Conclusion.

As I said in an earlier portion of this memorandum, the County of Nassau has furnished specifications touching upon other retainers by the Coverdale firm by other railroads, contending that so long as the Pennsylvania Railroad had some financial interest in other railroads which hired the Coverdale firm, then that firm can never properly function in a proceeding adverse to the Pennsylvania Railroad. In one instance, for example, it appears that the Coverdale firm studied the affairs of Pittsburgh Terminal Coal Corporation. This concern supplied more than half the traffic of a railroad known as Pittsburgh and West Virginia. One Taplin, who controlled the coal company, was once the beneficiary of a loan made by Pennroad. In other words the contention seems to be that because Pennroad loaned Taplin some money, and the Coverdale firm made a study of a company controlled by Taplin, then the Coverdale firm is disqualified honestly to act for the trustees of the Long Island Railroad, because of the Pennsylvania "connection". A mere recital of these sample facts demonstrates that these blanket charges (claim 3, footnote 1, *supra*) are not even relevant.

During the proceedings I think it became evident what the real position of Nassau is:

"The Court: If you will forgive me, you say your contention boils down to this, although they are competent, and although you do not challenge their honesty, you feel that the public won't be satisfied with the appointment of these—

"Mr. Judd: These engineers in a situation like this, where there have been serious questions raised concerning the relationship between the Long Island and the Pennsylvania. In a case like that they should be like Caesar's wife, above suspicion."

■ The briefs furnished in support of Nassau's position might give the impression that the solution for all of the troubles of the Long Island Railroad is to be found only in an attack upon the Pennsylvania Railroad, that the trustees are "evenly divided", and that this situation requires the appointment of super-trustees in the form of consulting engineers who have had no prior connection, direct or indirect, with the Pennsylvania Railroad. But that is not a fair appraisement of the situation, at least as I see it. Possible litigation against the Pennsylvania is merely one phase of the matter. The true objective of the trustees, and the one most difficult to achieve, is to put the Long Island Railroad on a permanent basis which will afford assurance to the community of safe, economical and reliable transportation. Putting the Pennsylvania connection to one side, it is a fact that the road has been losing substantial sums of money each month, and these deficits cannot be cured by litigation. The argument about "even division" of the trustees was vigorously pressed before the Interstate Commerce Commission, and that body, which has the final say in the selection of trustees has taken pains to point out that

446

there is no analogy between a trusteeship in reorganization and a directors' meeting, at which a majority will control and want of a majority will produce a stalemate. Each trustee, the Commission points out, can act for himself, and in case of dispute, will be bound by the instructions of the court. Moreover, as I have just pointed out, consulting engineers are definitely not super-trustees: it would be not only wrong but ridiculous for trustees to attempt to hide behind the advice of consulting engineers whose principal role, whatever counsel for Nassau may say to the contrary, is to find the facts and to submit those facts to the trustees and their counsel. It may be relevant here to note that the Public Service Commission of the State of New York is now conducting a thorough investigation into the affairs of the railroad, and has in that connection retained an eminent transportation engineer. It is and has been the intention of the trustees and of the court to establish complete harmony, if possible, among all the public bodies and persons officially concerned with the case to the end that the best result possible can be achieved. In the course of that operation factual mistakes may occur, but the responsibility of the trustees and these public bodies will never shift. The record contains an illustration of this. When the Henry Hudson Bridge was projected, the Coverdale firm, acting for bankers, and in connection with an enterprise in a field new to them, seriously underestimated the revenues that the bridge would produce. But despite these underestimates, Commissioner Moses and those charged with the duty of furnishing new means of transportation, proceeded with the project and pressed it to a successful conclusion. The Coverdale firm, through the partner who handled the matter (Slater), frankly conceded that in this instance it made a mistake, and had been too cautious, as later events proved. But nobody in the case contends that they should be blamed, any more than anyone ought to contend that if their estimates had been strictly accurate, then the praise for the completion of the project would be theirs. As will be seen later, it was proved from the mouth of one of Nassau's own witnesses that the Coverdale firm has a reputation and record of high competence which is not seriously challenged, particularly in the field of railroad transportation.

There is also to be found in the briefs what may be a suggestion that even though not one of the "claims" or "specifications" might, standing alone, furnish an obstacle to the appointment of the Coverdale firm, yet taken altogether they make a case. This is as much as to say that by multiplying unfounded counts a good indictment can be laid. But I do not think that counsel for Nassau means quite that. I think the argument is that to the Long Island public the name of Pennsylvania is as one Nassau witness called it "anathema", and even unfounded and unfair suspicion is enough to brand the Coverdale firm as unfit to serve.

One curious incident took place during the hearings. Counsel for Nassau called a witness to testify to the reaction of the public toward the appointment of the Coverdale firm, the person in question being a lawyer of standing and the Mayor of the Village of Lawrence. After counsel had laid the groundwork for testimony by the witness that there was bad feeling against the Pennsylvania on the part of users of the railroad, I asked him whether he knew the Coverdale firm, and he said he did. I then asked him what he knew about them and he made the following response:

"The Witness: I have the very highest regard for their engineering ability. And if my recollection serves me correctly I have consulted with them in relation to matters in which clients were involved; and in so far as their reputation as engineers is concerned, I would say in the vernacular it was 'tops'."

There is still another strange incident to be found in the record. The answer to the petition contains a demand that the County of Nassau, as a political subdivision and through its executive, be given a voice in the selection of engineers, or, to quote from a letter in evidence: "The county would like to participate in the considerations for the designation of such engineering firm". Now undeniably the County of Nassau has at least one substantial interest adverse to the debtor, namely, the matter

of taxes, and this proceeding is replete with references to the fact that the debtor may be required to take steps to reduce the Nassau taxes. Yet counsel for Nassau, and the county executive, saw nothing wrong in demanding participation in the selection of trustees' engineers, who would be bound to inquire into taxes, and possibly to testify in a proceeding adverse to Nassau. It seems to me in this position lies a recognition of the fact that engineers, concededly competent and honest, can perform their duty properly in spite of prior relations (even participation in their appointment (with the parties involved, and that it is fallacious to attempt to make an analogy between this situation and one in which a lawyer represents conflicting interests.

To deny the application of the trustees under the circumstances here found would be unjustly to put upon the Coverdale firm the stigma of rejection, without the slightest basis in fact or in reason. I grant the application of the trustees.