CENTRAL RY. SIGNAL CO. v. LONGDEN.
No. 10402.

United States Court of Appeals
Seventh Circuit.
Jan. 15, 1952.
As Amended Jan. 31, 1952.
Rehearing Denied March 14, 1952.

Cole, Wildman & Cole, Albert H. Cole, Peru, Ind., David W. Kahn, New York City, William M. Kahn, New York City, of counsel, for appellant.

Hugh G. Freeland, Peru, Ind., Harold L. Fierman, New York City, Arthur M.

Borden, New York City, of counsel, for appellee.

Before KERNER, DUFFY and LINDLEY, Circuit Judges.

LINDLEY, Circuit Judge.

In its complaint in the District Court, plaintiff averred that defendant Ralph L. Longden, through the instrumentality of defendant Victory Ordnance Corporation, while president of plaintiff, diverted a corporate opportunity presented in the form of proposed facilities and supply contracts with the Navy Department of the United States for loading 20mm. antiaircraft shells. The court entered judgment in favor of plaintiff and against defendant Ralph L. Longden for $84,000 and against each of defendants Ralph L. Longden and Edna S. Longden in the sum of $7500, the total of which, however, the court held should be credited with $52,900. The court further decreed that all assets of defendant Victory Ordnance Corporation are in equity the property of plaintiff, that Victory holds them as trustee for the benefit of plaintiff, subject to appropriate accounting by defendant for the income and disbursements of Victory subsequent to December 31, 1947, and directed transfer and delivery to plaintiff of certificates representing all of the outstanding shares of Victory's capital stock. This appeal followed.

Defendants urge that the court erred in finding that they had diverted a corporate opportunity from plaintiff and in failing to find that, if such a diversion occurred, plaintiff had acquiesced in and fully ratified what had been done by defendants; that the court should have found that a full and complete agreement of compromise and settlement, carried out by defendants, bars maintenance of the suit; that, in view of the fact that Noma Electric Corporation of Maryland, who now owns 99% of the capital stock of plaintiff, acquired it long after the acts of diversion were committed, plaintiff's action is barred; that, if plaintiff is entitled to recover, the court should have limited the judgment to such stockholders as held shares at the time of the diversion; that plaintiff is barred by laches; that it came into court with unclean hands, and that the court erred in denying defendants' motion for a new trial.

The court made lengthy findings of fact and conclusions of law. It found substantially as follows: Plaintiff, a Massachusetts corporation, was organized in June, 1930, to take over a predecessor company. Defendant Longden had been associated with the predecessor company as comptroller and came to the plaintiff upon its organization as, and continued to be, until October 1, 1947, its president, general manager and chief executive officer. On July 31, 1950 the Triumph Explosives, later Triumph Industries, Inc., and still later Noma Electric Corporation of Maryland, bought from Longden and the other stockholders 27,083 shares of plaintiff's common stock out of a total issue of 27,933 shares. Noma later bought additional stock.

Prior to 1941 plaintiff, as well as its predecessor, had manufactured and sold railway fusees, flares used in the operation of trains, and track torpedoes, which are pellets which explode when trains run over them. It had a plant in Indiana, one in Pennsylvania, another in Massachusetts and still another, through a subsidiary, Pacific Railway Signal Company, in California. Its principal office was at 272 Center Street, Newton, Massachusetts. Triumph Explosives had manufactured fireworks and had attempted, without success, to manufacture and sell railway fusees. Sale of fireworks being on the down grade by reason of prohibitory legislation, Triumph in 1940 and 1941 had turned to the manufacture of munitions and war materials for foreign governments. After obtaining control of plaintiff, Triumph ceased manufacturing fusees and torpedoes and took a contract with the United States for the manufacture of Mark IV Fuses or percussion primers, and was preparing to manufacture 40 millimeter antiaircraft shells for the Navy.

On March 6, 1939, Longden entered into employment contracts with both plaintiff and Triumph, which expired on December 31, 1941, under which plaintiff paid Longden an annual salary of $12,000 plus a bonus computed on a percentage of plaintiff's net profits. Under his contracts,

Longden directed the operations of plaintiff just as he had before the sale of his stock to Triumph. After his agreement with plaintiff expired on December 31, 1942, he continued to manage the company as before, until a new contract was executed on June 1, 1942. At that time, of the seven members of the Board of Directors of plaintiff, four were connected with Triumph Explosives. The plaintiff's Board of Directors unanimously adopted a motion that "Longden investigate the possibility of our company undertaking a job of loading MK 19 percussion primers at our plant in Hammond, Indiana, or at a plant located in East St. Louis, Illinois, as a sub-contractor for Triumph Explosives, Inc.; and that written confirmation be obtained of any arrangement made with Triumph Explosives, Inc., if it develops that this work will be undertaken by our company." Percussion primers are highly explosive. Plaintiff could not have manufactured them in its Indiana, Pennsylvania or Massachusetts plants but might possibly have done so at its plant in East St. Louis, Illinois.

Pursuant to these instructions, Longden sent McNulty an employee of Central, to Washington on February 6, 1942, to ascertain whether it was feasible for plaintiff to attempt to procure a Navy contract to manufacture percussion primers. McNulty was then working for plaintiff at $75 a week. He proceeded to Washington and, upon returning, told Longden that the Navy had all the primers or fuses it then needed but that it could well use 20 millimeter ammunition. McNulty then said "this is something we want to take for ourselves,— I want a part of it." Longden agreed with McNulty that this was an opportunity which the two of them should take for themselves. Consequently, in March Longden caused the corporate defendant Victory to be organized, with an authorized capital of $50,000, with himself and his wife, Edna, as officers, directors and controlling stockholders. Longden continued to operate and to dominate plaintiff.

McNulty had also reported to Longden that the Naval authorities had suggested that the National Fireworks plant located in Massachusetts was a reliable source for information on the methods of manufacture of 20mm. ammunition. Longden asked that company to furnish a corporation, to be known as Victory Ordnance, with necessary information and data and to supervise construction of a plant which the Navy Department, he said would finance for Victory. McNulty, still an employee of plaintiff, was directed to find a site suitable for the facilities which the Navy was to construct. In Peru, Indiana, he found property which met Navy qualifications and negotiated a lease for it early in March 1942, on behalf of Victory.

On February 26, 1942, Longden submitted to the Navy a written proposal for loading 20 millimeter ammunition, signed by Longden and bearing beneath his signature "Central Railway Signal Company, Inc., 272 Center Street, Newton, Massachusetts." On April 13, 1942, at a conference between Longden and Navy officials, a representative of the Navy stated that "The Victory Ordnance Corp. made a proposal to the Bureau of Ordnance to become a manufacturer of 20mm. ammunition originally under the name of the Central Railway Signal Corporation. They have since found that their property is too small in area; so they have formed a new corporation and are incorporated in the state of Indiana. They have selected and acquired a site at Peru." He asked Longden whether the "subsidiary" had any paid-in capital. Longden replied that "they have a small capital of $25,000." On May 12, 1942, at a similar conference, Longden produced, not a balance sheet of Victory, but one of plaintiff. He answered questions regarding the past profits of plaintiff and was asked whether the plaintiff was the parent organization of Victory. He replied that Central had an investment in Victory but that he himself had "the majority investment."

The court found that the inference to be drawn from the foregoing facts and from the entire record is such as to establish the fact that the Navy was under the false impression that it was dealing with a company which had been organized by plaintiff to handle its contracts for war materials; that this inference was warranted by the manner

in which Longden answered the questions put to him by the Naval officer, and that at no time did Longden attempt to correct the Navy in its mistaken view that Victory was a part of plaintiff.

Longden made use of the services and time of plaintiff's employees in connection with the development of Victory, such as McNulty, Friis, chief chemist, Kemp, a bookkeeper, and Miss Simms, a secretary. However, plaintiff was reimbursed by Victory for their services, at least in part. McNulty was taken into Victory, given a substantial increase in salary and made vice president, while he was still employed by plaintiff.

At the time Longden presented the application for Navy contracts, the corporate defendant had had no experience in the manufacture of antiaircraft ammunition other than the general experience which Longden had acquired in his connection with plaintiff. Plaintiff was in excellent financial position and could have carried out the Naval contracts. Victory's contract obligations were for the most part financed by loans secured by assignment of payments due under the supply contract.

In April 1942, Longden entered into a facilities contract and, in June, 1942, a supply contract with the Navy. Under the terms of the former, the government undertook to finance the construction of the necessary production plant in Peru, spending eventually $895,000. The initial supply contract, under which the Navy ordered 20mm. ammunition, amounted to approximately $2,500,000 and similar later contracts to another $2,500,000.

The court found that the opportunity to acquire the 20mm. ammunition contract was appropriate for the normal business expansion of plaintiff; that in 1942 this was such an opportunity as might have been offered to and sought by a corporation in a business such as plaintiff's by reason of the war conditions existing at that time; that knowledge of the opportunity came to Longden by reason of his official position with plaintiff at a time when Central was seeking contracts for defense work; that, in acquiring the opportunity for himself through Victory, Longden availed himself of plaintiff's employees, facilities and reputation; that, accordingly, Longden, in violation of his fiduciary duties, wrongfully diverted from plaintiff the Naval contracts referred to and the profits and benefits arising therefrom; that at no time during the course of the foregoing events and not until the time of the trial of this cause, did Longden disclose to the Board of Directors of plaintiff the circumstances under which he first learned of the opportunity to acquire the Naval contracts or the extent to which he had made use of corporate employees, facilities and reputation of plaintiff in acquiring the contracts; that at all times he merely advised the Board of the acquisition of the contracts as an accomplished fact.

On May 1, 1942, Gustav H. Kann, a director, told Longden that he knew Victory had been organized and would probably get some contracts from the Navy and that he desired to have executed the new employment contract of Longden with plaintiff which had been pending for sometime. The two agreed upon the terms and Kann asked whether plaintiff could have a participation in Victory. Longden replied that plaintiff could purchase a $10,000 interest, or 40% of the capital investment of $25,000. Following this, the directors authorized execution of the employment contract and the investment suggested, namely, that Longden invest plaintiff's funds to the extent of $10,000 in Victory's outstanding stock. Thereafter 40% was issued to plaintiff. However, additional stock was issued to defendant Longden so that there was, eventually, a fully paid-up capital of $50,000.

Following execution of the contracts with the Navy, Victory's plant was constructed in Peru. It began operation in January, 1943, and continued manufacture of ammunition until August 19, 1945, when it ceased. At the time of the suit, some 200 people who were stockholders in Triumph in 1942 were still stockholders in Noma Electric Corporation, its successor.

Henri Sadacca, president of Noma, became a director of Triumph early in 1944. Shortly thereafter plaintiff's Board of Directors, at his suggestion, directed Longden to sell certain outside interests owned by

plaintiff and to invest the proceeds in United States Bonds. Longden then offered to purchase the 2000 shares of Victory's capital stock owned by plaintiff for $12,900 and the Board of Directors resolved to accept his offer. However, later, Sadacca objected to this latter action and told Longden that he had "pulled a fast one." On January 12, 1945 at an adjourned meeting of the stockholders, everything done after the meeting of January 14, 1944 was approved, with the exception of the action authorizing the sale of the 2000 shares of Victory to Longden for $12,900; this was disapproved.

Victory's ammunition manufacture ceased in August, 1945. Thereafter Victory purchased from the Navy the facilities the latter had erected at a cost of $985,851.82 for $29,501. It had obtained leases on the land where the plant was located, for so long as the plant continued to be maintained on the premises.

In June, 1945, Longden suggested that plaintiff's general office be moved to Peru, where this property was located. Victory then acquired options to purchase the land. On October 31, 1945, Longden stated to plaintiff's board that negotiations were in progress to buy from the Navy the facilities in Peru and offered to sell to the plaintiff such facilities as it might acquire from the government for $10,000, conditioned, however, on plaintiff assuming liability for the rental of over 1000 acres of land, the rates varying from $10 to $15 per acre, until the property might be vacated by plaintiff. At a meeting on March 27, 1946, the board considered Longden's proposal to sell to the plaintiff, for $10,000, all facilities acquired by Victory from the Navy which could be utilized by the plaintiff. Longden reduced the purchase price to $1, plus an unconditional release of any and all liability on account of the transaction involving the sale of 2000 shares of Victory stock owned by Central. The board accepted the offer and ratified the sale of the Victory stock to Longden. Longden told Sadacca that the owners of the real property in Peru would not sell. He failed to disclose at any time that the nature of Victory's interest in the property had changed from a leaseholder's

interest to an option to acquire title. In the latter part of December, 1945, the options which Victory held were taken up and contracts of purchase with the land owners made. On April 1 plaintiff's offices were moved from Newton, Mass., to Peru, Indiana.

A dispute arose between Longden and other directors over Longden's failure to furnish financial information and records covering the previous years. Longden was, in effect, directed to take a leave of absence while investigation was made of the complete financial transactions of plaintiff and of the possibility suggested by some of plaintiff's stockholders that in some of the transactions Longden had had an interest adverse to the corporation. Following this investigation, the complaint was filed.

The court further found that Longden, in violation of his fiduciary duties to plaintiff, wrongfully diverted from plaintiff to himself and his wife, a corporate opportunity to obtain Navy contracts for the loading of 20mm. ammunition; that plaintiff is not estopped from bringing this action, that there was no ratification of the wrongful diversion and that plaintiff did not come into court with unclean hands and was not guilty of laches in bringing the action seeking to recover the corporate opportunity. The findings were followed by conclusions of law resulting in the judgment aforesaid.

■■■■ If the findings of the trial court are not clearly erroneous, they may not be successfully impeached in this court, for it is not our function to pass upon or consider de novo the evidence received at the trial or to weigh controverted evidence. Findings may not be set aside unless clearly erroneous, giving due regard to the opportunity of the trial court to judge the credibility of the witnesses. Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A.; West v. Schwarz, 7 Cir., 182 F.2d 721, 722; Moths v. U. S., 7 Cir., 179 F.2d 824. This rule applies to all reasonable inferences of the trial judge, for it is for him to determine the propriety of the inferences and conclusions to be drawn. His is the primary function of finding the facts and choosing from amongst conflicting factual inferences

those which he considers most reasonable. Even where there is no dispute about the facts, if different reasonable inferences may be fairly drawn from the evidence, we are forbidden to disturb the findings based on such inferences unless they are clearly erroneous. Gaytime Frock Co. v. Liberty Mut. Ins. Co., 7 Cir., 148 F.2d 694, 696. See also Hacock v. Eck, 7 Cir., 183 F.2d 632, 635; Moths v. U. S., 7 Cir., 179 F.2d 824.

Realizing these limitations upon our functions, we have examined in detail the record submitted in this appeal and, after such examination, find it devoid of anything that would justify us in saying that the findings are erroneous. It matters not what our own judgment might have been had we been the trial court, for, inasmuch as the evidence, viewed most favorably to plaintiff, contains adequate evidence, including the reasonable inferences of the court, to suport the findings, we must accept them for what they are.

In this situation, it would seem that we well might end the controversy between the parties at this point, for there can be little question as to the law generally covering the actions of officers and directors of corporations with reference to diversion of corporate opportunities. It is established here that there was an opportunity to enter into the contract with the Navy; that the board of directors had instructed Longden and his associates to approach the government with that purpose in mind; that plaintiff was in a position to and had had the experience necessary to manufacture ammunition properly and successfully; that McNulty, an employee of plaintiff, acting for Longden, found the opportunity; that he advised Longden of that opportunity and proposed that the two of them keep it for themselves; that they proceeded so to do; that the employees and facilities of plaintiff were utilized in getting a new corporation started and put in operation. Many other corroborative facts, some of which are included in the findings and many of which are not mentioned therein, appear in the record.

It cannot be denied that Longden occupied a fiduciary position and owed an obligation to plaintiff to develop the opportunity for it and in its behalf, and to refrain from doing anything that might work injury to his beneficiary or deprive it of profit or advantage which his skill, knowledge and ability might personally bring to it or enable it to realize in the reasonable exercise of its power. Pepper v. Litton, 308 U.S. 295, 311, 60 S.Ct. 238, 84 L.Ed. 281; Guth v. Loft, Inc., 23 Del. Ch. 255, 5 A.2d 503, at page 512; Durfee v. Durfee & Canning, Inc., 323 Mass. 187, 80 N.E.2d 522. It was also his affirmative duty to disclose fully all the circumstances of the transaction in which he procured an interest, inasmuch as it is clear that the corporation desired to enlarge its field of manufacture to include something related to its former product, in a field in which it had had experience and was seeking a Navy contract. Longden, as a part of his fiduciary duty, should have called to the attention of the board everything said to him or McNulty by the Naval authorities before he consummated any contract in the name of his alter ego, Victory. It may be that in failing to make such a disclosure, he was not guilty of bad faith, but he failed to realize and discharge his duties in the premises and, on the contrary, wrongfully assumed that, as the directing head of plaintiff corporation, he had a right to take the opportunity himself without informing those whom he was serving, the board of directors. This, he was not permitted to do. See Production Mach. Co. v. Howe, Mass., 99 N.E.2d 32; Volk Co. v. Fleschner Bros., Sup., 60 N.Y.S.2d 244. As stated by Cardozo, J. in Wendt v. Fischer, 243 N.Y. 439, 443, 154 N.E. 303, 304. "If dual interests are to be served, the disclosure to be effective must lay bare the truth, without ambiguity or reservation, in all its stark significance." Consequently, in view of the court's finding of diversion and of the failure to disclose the facts until the time of the trial, it follows that the diversion was wrongful and that plaintiff was entitled to relief.

It should be observed, in this connection, that the court found, as we have noted, that Longden took to himself extensive use of plaintiff's facilities and prestige. He was able to start manufacture

as quickly as he did, only because he had at hand in plaintiff's organization a crew well equipped for the work, such as McNulty for contract work, Friis for engineering work, Edmonds for technical advice and Kemp for bookkeeping. Then, too, the court found that he misled the Navy into believing that Victory was a corporate organization belonging to plaintiff, formed by plaintiff to perform this work and that he permitted the Navy to believe that its contract would be guaranteed by the experience, prestige and credit of plaintiff. He did not correct these misapprehensions. In Bailey v. Jacobs, 325 Pa. 187, 189 A. 320 at page 324, the court said: "Directors * * * must act in the utmost good faith, and cannot deal with the funds and property of the corporation, nor utilize the influence and advantage of their offices, for any but the common interest. If they make a personal profit through the use of corporate assets, they must account for it to the stockholders. It is immaterial that their dealings may not have caused a loss or been harmful to the corporation; the test of liability is whether they have unjustly gained enrichment."

■ When Longden availed himself of plaintiff's employees to render service in support of his own venture, he necessarily wrongfully usurped what belonged to plaintiff. True, some of the money Central paid out on behalf of Victory was repaid, but that fact in itself does not excuse the original wrongful misuse of what belonged to plaintiff, for "If directors undertake to acquire property for the corporation, they act in a trust capacity in acquiring it. Express direction by the corporation to them to purchase is not a requisite of liability in this respect. Nor does the fact that they have a right to deal personally in leases modify their duties as directors when their transactions touch the corporation itself. Their obligations and liabilities arise out of their trust duties in dealing fairly with the corporation. If they purchase personally, with the intention to sell to the corporation, or while purporting to act as corporation officers, the whole benefit of the purchase inures to the corporation, and the rule of secret profits applies." Bliss Petroleum Co. v. McNally, 254 Mich. 569, 237 N.W. 53, 55.

■ That the corporate opportunity diverted was appropriate for the plaintiff is apparent from the court's findings and from the evidence in the record. As was said, in Guth v. Loft, 23 Del.Ch. 255, 5 A.2d 503, 514. "* * * Where a corporation is engaged in a certain business, and an opportunity is presented to it embracing an activity as to which it has fundamental knowledge, practical experience and ability to pursue, which, logically and naturally, is adaptable to its business having regard for its financial position, and is one that is consonant with its reasonable needs and aspirations for expansion, it may be properly said that the opportunity is in the line of the corporation's business."

In Lutherland, Inc., v. Dahlen, 357 Pa. 143, 151, 53 A.2d 143, 147, the court commented: "In short, there is demanded of the officer or director of a corporation that he furnish to it his undivided loyalty; if there is presented to him a business opportunity which is within the scope of its own activities and of present or potential advantage to it, the law will not permit him to seize the opportunity for himself; if he does so, the corporation may elect to claim all of the benefits of the transaction."

Defendants insist they have in nowise wronged plaintiff. Their reliance upon Solimine v. Hollander, 128 N.J.Eq. 228, 16 A.2d 203, 217, in this respect seems misplaced, for that court adhered to the rule that we have announced. Thus it said: "A director or officer of a corporation cannot use corporate assets to acquire, finance or develop his own individual business project or venture and insist that either the venture or the profits thereof are his own property. When such diversion or misappropriation of corporate assets is established, the aggrieved principal may elect either to recover the diverted assets or enforce a constructive trust with respect to the venture and its resulting profits. This rule is not peculiar to * * * directors and officers but underlies all fiduciary responsibility."

However, the facts in that case were such as to require a decision differing from that in the present case. Other cases are cited by defendants but, after careful consideration, we are convinced that they are not applicable, in view of the court's findings, which, we have found, are adequately supported by the evidence.

■ Defendants urge strenuously that if the defendants were guilty of wrongful diversion of a corporate opportunity, what they did was ratified by the corporation or, if not ratified, laches barred the suit. True it is that the court's finding in this respect is included in its conclusions of law, but its actual physical placement is immaterial. It is quite as binding, though improperly termed a conclusion of law when it is actually a finding, as if it were formally included in the findings of fact. Benrose Fabrics Corp. v. Rosenstein, 7 Cir., 183 F. 2d 355. Though we have indicated that the findings in this respect are adequately supported by substantial evidence it may well be that we should give some consideration to the facts, in view of defendants' zealous argument in support of ratification.

■ Defendants contend that the resolution adopted June 25, 1942, reemploying Longden as president and approving the purchase of a 40% interest in Victory, constituted a ratification of the wrongs complained of. However, the testimony of Longden, himself, is that he disclosed to the directors no information in addition to that which he had previously given to Hewes and Kann. They knew nothing about McNulty's interview in Washington or his later report to Longden. Longden neither then nor at any other time informed them of the manner in which the contract had been obtained or the proposal financed or of who had met with the Navy, or of what the Navy had said. Indeed, he testified that he made no attempt to bring anybody up to date. The only information known to any director was that he had told Hewes that he had organized a company to do some war work; none of the other facts, as the court found, was ever disclosed. In Durfee v. Durfee & Canning, Inc., 323 Mass. 187, 203, 80 N.E.2d 522, 531, the court declared: "For 'a cestui que trust to "ratify" or con-

firm a breach of trust, he must be apprised of all the material facts and as well of their legal effect. No half-hearted disclosure or partial discovery is sufficient in either respect. The trustee's duty of disclosure is not discharged by leaving the cestui to draw doubtful inferences, conclusions and suspicions' ".

The Indiana law seems to be the same. Schemmel v. Hill, 91 Ind.App. 373, 169 N.E. 678, 684. As the Supreme Court of Illinois said, in Farwell v. Pyle-National Electric Headlight Co., 289 Ill. 157, 124 N.E. 449, 453, 10 A.L.R. 363. "So far as the questions of ratification and laches are concerned, knowledge of the stockholders is necessary before their act or failure to act can bar their rights. They had a right to rely upon the fidelity of the directors to their trust, and were not bound to know or exercise reasonable diligence to discover the facts which it was the duty of the plaintiff in error and the directors associated with him to disclose by reason of the relation of trust and confidence arising out of their position."

One cannot ratify that which he does not know, and the burden is upon him who relies upon ratification to show that it was made with full knowledge of all material facts. Under these authorities, in view of the evidence submitted, the trial court was clearly warranted in finding that, there having been no disclosure of the facts as they actually existed, there was no ratification.

■ As previously indicated, it is quite generally the law also that there must be knowledge before there can be laches. "There can be no laches where delay has been caused or induced by fraud or concealment, and a party is not deemed to be guilty of acquiescence if he is without knowledge of a fraud, or where the existence of fraud has been concealed from him." In re Indiana Concrete Pipe Co., D.C., 33 F.2d 594, 596. It is the law of Indiana as well as Massachusetts that the question of laches is one of fact. Steifel v. Farmers State Bank, 89 Ind.App. 692, 168 N.E. 30; Suburban Land Co. v. Town of Billerica, 314 Mass. 184, 49 N.E.2d 1012, 147 A.L.R. 660. Moreover it has been held

that where a president dominates a corporation, the company is not barred by the passage of time. Concerning such a situation, in Daniels v. Briggs, 279 Mass. 87, 180 N.E. 717, 718, the court said: "While it may well be that he could not excuse himself from responsibility to others for failure to inform himself with regard to the matters of which he [now] complains, we think it is open to him on behalf of the corporation to institute proceedings for recovery. * * * The real beneficiary of this proceeding is the corporation. As against it there is no merit in the defense of laches." Nor will delay which does not work disadvantage to defendant constitute laches. Norton v. Chioda, 317 Mass. 446, 58 N.E.2d 828; Ryason v. Dunten, 164 Ind. 85, 73 N.E. 74.

■ Defendants assert that plaintiff is barred from bringing the action because it came into court with unclean hands. They base this argument upon an asserted necessary inference that Sadacca was attempting to blackmail Longden to force him to buy Noma's stock. However, the record does not disclose any such duress. It does establish that Sadacca was endeavoring to find a purchaser and nothing more. The trial court refused to find otherwise and we find nothing erroneous in its action.

The court found that Longden's concealment of the conversion, for Victory, of its lease of the Peru property to a fee-simple title was a further breach of his fiduciary duty, to which, defendants strongly object. They contend that, at that time, Longden and Sadacca were dealing at arm's length. It appears, however, that during the period of the discussion concerning purchase of the Victory property by plaintiff, the existing leases for certain property had been exchanged for deeds to part of the property and installment purchase contracts for the balance. Although Longden had been requested to purchase on behalf of plaintiff, he never disclosed the change in Victory's status with respect to such property, but affirmatively misstated that the farmers would not sell, when he knew that he alone, through Victory, had control of the property.

■ Defendants urge that, inasmuch as more than 99% of the stock in plaintiff is owned by Noma, which had no interest in plaintiff at the time when the events complained of occurred, the judgment should not have been in favor of plaintiff but should have been for the benefit of only the stockholders who were such at the time of the acts complained of. The facts are that Triumph was, at the time of the diversion, the principal stockholder of plaintiff, that Triumph changed its name to Noma. Therefore, as a matter of fact, there has been no change of ownership of plaintiff by operation of law; ownership continued in the merged company with the same force and effect as if it were still named Triumph. But, irrespective of this, we think the doctrine of contemporaneous ownership, as defined in Rule 23(b) of the Federal Rules of Civil Procedure does not apply to a suit by a corporation. The title of the rule is "Class Actions" and the pertinent portion is designated, "Secondary · Action by Shareholders." It provides that where a stockholder institutes a class action because of the corporation's refusal to enforce rights which it might properly assert, the complaint must aver that the plaintiff was a shareholder at the time of the transaction of which he complains or that his share thereafter devolved on him by operation of law. Under the rule, the complaint must set forth with particularity the efforts of the plaintiff to secure from the managing directors such action as he desires and the reasons for his failure to obtain such action or for not making the effort. It is clear that the rule has to do with a secondary action by shareholders and not with primary actions by incorporated or unincorporated associations; it has no application where the corporation brings the action itself to enforce its own right, as here. A convincing exposition of the rule appears in Overfield v. Pennroad Corp., D.C., 48 F. Supp. 1008, 1018, where the court said: "* · * * The benefit of a derivative action brought on behalf of the corporation necessarily results to all shareholders equally, even though some of them may have been precluded from bringing action on their own behalf. To permit the recovery to be diminished in proportion to the holdings of such stockholders would be to

transform the derivative action into one for the benefit of individuals and not of the corporation. The theory of the action must be recognized and the whole recoverable amount must be paid to the corporation notwithstanding the individual standing of particular stockholders."

A pertinent comment in this respect appears in Hooker, Corser & Mitchell v. Hooker, 88 Vt. 335, 92 A. 443, 448: "It was no objection to the maintenance of this suit that the stockholders had changed since the alleged wrongdoing, and therefore the recovery would inure to the benefit of some who were not stockholders at the time of the occurrences complained of. Such is frequently, if not usually, the case. The mere fact of a change in the stockholders is no defense to a suit like this. As well might a debtor of a corporation defend on the ground that, if he paid, his money would benefit some stockholders who were not such when he became indebted."

Defendants rely in this respect upon Home Fire Insurance Co. v. Barber, 67 Neb. 644, 93 N.W. 1024, 60 L.R.A. 927, but, as we read that case, the court held essentially merely that, where all the stockholders of a corporation had purchased stock with full knowledge of wrongful acts on the part of the seller, they could not, themselves, by virtue of contract with the seller, enforce any claim by reason of such wrongful act. The decision has no application, we think, to an action instituted by the corporation in behalf of all its stockholders. Thus, in Hooker, Corser & Mitchell v. Hooker, supra, the court said, concerning the opinion: "The case, however, was one in which all the stockholders were subsequent ones, and the recovery would be entirely for the benefit and advantage of those who were not stockholders at the time of the alleged misdoings. It is the manifest doctrine of the case that if any of the stockholders were such at the time of the occurrences charged, the suit could be maintained."

From Overfield v. Pennroad, D.C., 48 F.Supp. 1008, 1018, it would seem that Judge Pound, who wrote the Home Fire decision, later changed his mind, for the court there said: "That case has been distinguished as to facts and law by the same very able authority who prepared the opinion itself, and by counsel who appeared for other parties, and we do not deem it controlling." See also Fortner v. Cornell, 66 Idaho, 512, 163 P.2d 299.

■■■■ Inasmuch as plaintiff is qualified to sue, the standing of the shareholders is immaterial. "To permit the recovery to be diminished in proportion to the holdings of such stockholders would be to transform the derivative action into one for the benefit of individuals and not of the corporation. The theory of the action must be recognized and the whole recoverable amount must be paid to the corporation notwithstanding the individual standing of particular stockholders. Keenen [Keenan] v. Eshelman, 1938, 23 Del.Ch. 234, 2 A.2d 904, 120 A.L.R. 227, affirming 22 Del.Ch. 82, 194 A. 40. * * * The damages awarded may therefore not be diminished by the proportion of the stockholders who were not such at the time of the transactions in question." Overfield v. Pennroad, D.C., 48 F.Supp. 1008, 1018. Nor does the Massachusetts law recognize the doctrine of limiting the recovery to the contemporaneous owner. Thus, in Peterson v. Hopson, 306 Mass. 597, 29 N.E.2d 140, 149, 132 A.L.R. 1, the court said: "It is no objection to the bill that the plaintiff is not alleged to have been the owner of preferred stock at the time of the alleged wrongdoing. In bills by minority stockholders of a corporation a few courts have denied relief to a stockholder who obtained his stock after the wrong had been accomplished. (Citing cases.) Home Fire Ins. Co. v. Barber, 67 Neb. 644, 93 N.W. 1024, an opinion by Pound, C. * * * But the weight of authority is to the contrary, that the cause of action for the wrongdoing of directors and officers is a part of the assets in which a stockholder has an indivisible interest transferable by a transfer of his certificate (citing cases) and that it is immaterial whether the stockholder who seeks to vindicate the right of the corporation was such at the time of the wrongdoing or not." See also Fortner v. Cornell, 66 Idaho 512, 163 P.2d 299.

Defendants filed a motion for new trial in which it sought, among other things, an

opportunity to secure the testimony of Captain Hubbard, one of the Naval officers with whom Longden and McNulty dealt, and tendered with their motion, an affidavit as to his testimony and the affidavit of Longden in an attempt to show diligence. Plaintiff answered by filing certain affidavits rebutting the averments of diligence. The court, upon disposing of the motion, found that there had been a lack of due diligence on defendants' part in failing to make a sufficient attempt to locate Captain Hubbard prior to entry of the findings and conclusions. However, it held that, in addition to the lack of diligence, there was another reason more compelling for overruling the motion. In other words, said the court, the testimony concerning the captain's intention at the time the Navy contracts were awarded, could not alter the unambiguous character of the statements and actions of the parties to those negotiations in evidence. The proposed testimony of Captain Hubbard, said the court, as to an oral order from his superior officer, "would not be of such weight as to necessitate different conclusions, when this testimony is viewed in the light of the other proposed testimony and in the context of the evidence submitted at the trial." The court concluded that Hubbard's intentions in dealing with Central could not affect the only finding on this issue that the evidence permits, namely, that Longden breached his fiduciary relationship by securing for himself a business opportunity which rightfully belonged to plaintiff and that Longden promoted his own interests when his fiduciary relationship to plaintiff required him to subordinate that interest to the interest of Central. That fact, said Judge Swygert, is determinative, but he added that the evidence leads further and inescapably to the conclusion that, in committing this act of disloyalty, Longden's conduct was calculated to create the impression in the minds of the Naval officer that Central was the real party in interest in the proposal to the Navy, and that, while it was unnecessary to speculate on what effect it might have had on their decision, it was evident that the Naval officers in charge of negotiating the contracts were under that impression at least at the time the facilities contract was awarded.

We are in accord with the court's conclusion that due diligence in the procuration of this testimony was not shown. The complaint was filed December 17, 1947. From that date, at least, defendants were fully advised that Hubbard was the principal officer representing the Navy, and that all of Longden's dealings with him would be of great importance, yet, on the record, no attempt was made between December 17, 1947 and March 29, 1949, when Longden's deposition was taken, to procure the testimony of Hubbard. His name was mentioned time and again in Longden's deposition and, if defendants did not know prior to that time that Hubbard was a material witness, they certainly were charged with such knowledge by Longden's testimony. The only attempt thereafter made by defendants consisted of a long-distance telephone call to the Bureau of Ordnance, Navy Department, Washington, on April 20, 1949. Longden testified that he was told that Hubbard was not in Washington but was on sea duty. He did not ask where Hubbard was and did not inquire as to whether there was any way by which he could obtain Hubbard's testimony. He did not try to obtain any information from the Navy, which could have been helpful in communicating with Hubbard. Longden did, in July, 1949, talk by telephone with Adams, a civilian in the Bureau, who told him that, in order to examine the Navy files, he would have to have a subpoena describing the documents issued by the court. However, he did not pursue his efforts to inspect the file or to contact Hubbard. We think there was no error in the disposition of the motion for new trial.

The trial court ordered Longden to repay to Victory the salaries drawn by him as its president during the years of its operation and thereafter from September 1942 to June 30, 1949, totalling $84,000. There is no evidence that Victory's operations were not properly managed. They involved production of some $5,000,000 worth of ammunition for the United States. Such undertakings are not self-operating;

they involve tremendous executive and administrative activities. Longden, president and general manager discharged those functions. No complaint is made of his efficiency, his ability or his success. Though we agree that the earnings of Victory belong to plaintiff, we can conceive of no reason in equity why the reasonable actual costs of management, administration and production, from which sprang the profits, should not be allowed. These include the salaries and wages of all contributing to the final result,—a profitable operation. Those expenses, those salaries, would have had to be paid if plaintiff itself had conducted the enterprise; they are a part of the cost of goods sold. Furthermore, though the manufacturing operations ceased in 1946, during the period thereafter, until June 30, 1949, Longden continued to render services of value to Victory and ultimately to plaintiff. No complaint is made that his salary was excessive. We know of no reason in equity why any of this compensation paid to him by Victory between January 1, 1942 and June 30, 1949 should be repaid. The chancellor should have allowed the reasonable cost of the undertaking, including reasonable salaries for the executive officers. Inasmuch as no attack is made upon the reasonableness of the sums paid, equity demands that the judgment for repayment of salaries paid to Mr. Longden be reversed. Otherwise plaintiff would be unduly enriched.

The judgment is modified by eliminating therefrom the requirement that the salaries paid by Victory to Ralph L. Longden be repaid to plaintiff; in all other respects it is affirmed.