134 F.Supp. 857 (1955)
AMERICAN INVESTMENT COMPANY OF ILLINOIS, Plaintiff,
v.
David B. LICHTENSTEIN, Key Finance Company, a corporation, Mercedes Lichtenstein, David B. Lichtenstein, Trustee for David B. Lichtenstein, Jr., David B. Lichtenstein, Trustee for Daniel B. Lichtenstein, Everett Best, William A. Gerard, and Lyle S. Woodcock, Defendants.
No. 9936(3).
United States District Court E. D. Missouri, E. D.
October 21, 1955.
Jones, Hocker, Gladney & Grand, by Lon R. Hocker, St. Louis, Mo., for plaintiff.
Mark D. Eagleton, and Bryan, Cave, McPheeters & McRoberts, by R. H. McRoberts, Sr., St. Louis, Mo., for defendants, David B. Lichtenstein, Mercedes Lichtenstein, David B. Lichtenstein, *858 Trustee for David B. Lichtenstein, Jr., and David B. Lichtenstein, Trustee for Daniel B. Lichtenstein.
Adolph K. Schwartz, St. Louis, Mo., for defendant, Key Finance Co.
Forrest M. Hemker, St. Louis, Mo., for defendants, Everett Best, William A. Gerard, and Lyle S. Woodcock.
HARPER, District Judge.
The American Investment Company of Illinois (hereinafter referred to as American), a Delaware corporation, filed its original complaint against David B. Lichtenstein (hereinafter referred to as Lichtenstein), defendant, alleging that while acting as a director of American, the defendant acquired for his own purchase, a financial interest in Liberty Loan Corporation (hereinafter referred to as Liberty), a Delaware corporation, without disclosing to American the opportunity to do so. Wherefore, American sought the imposition of a constructive trust for the benefit of American to account for all profits and benefits received by defendant as a result of the said acquisition.
Thereafter, American filed an amended complaint and joined as additional parties, the defendant, Key Finance Company, a Missouri corporation, Mercedes Lichtenstein, wife of David B. Lichtenstein, David B. Lichtenstein, Trustee for David B. Lichtenstein, Jr., David B. Lichtenstein, Trustee for Daniel B. Lichtenstein, Everett Best, William A. Gerard and Lyle S. Woodcock.
Jurisdiction is based upon diversity of citizenship, and the amended complaint alleges, in substance, that the defendant, David B. Lichtenstein, while acting as a director of American, together with the other named defendants, in pursuance of a conspiracy, acquired 184,547 shares of common stock of Liberty, and that said acquisition was a business opportunity, which, if disclosed to American, American would have been ready, willing and able to embrace, and American is now ready, willing and able to embrace said opportunity, and by reason thereof the defendants are liable as constructive trustees for the benefit of American.
The facts disclose that American (a multi-million dollar corporation), is and has for many years been engaged in the business of consumer finance and personal loans. Lichtenstein has been connected with American since about 1928, and prior to the abolition of the office of executive vice-president on May 24, 1954, had been executive vice-president for many years, and had also been a director of American for many years, up until February of 1955.
Donald Barnes (hereinafter referred to as Barnes), is and has been a director and president of American for many years. Since July 20, 1954, Lichtenstein has been president and a director of Liberty, the principal office of which is located in Chicago, Illinois. Prior to November of 1954, Liberty had outstanding, two classes of common stock, Class A and Class B. The Class B stock had the right, voting as a class, to elect the majority of the Board of Liberty. Of the 7,500 shares of Class B common stock, 7,241 shares (hereinafter referred to as the B stock), were owned by I. H. Levy and his family, and this block of 7,241 shares had been offered for sale for a number of years prior to July 20, 1954, at various prices ranging from $1,700,000 to $2,000,000. The price per share sought for the B stock was 13 to 15 times the market price per share of the Class A common stock, although it paid the same dividend as the Class A common stock, and was in other respects equal to the Class A common stock, except for the element of the control of the company.
Lichtenstein, while vice-president of American, had assisted in the negotiations for the acquisition by American of capital stock or assets of other companies engaged in the same business as American, and in the latter part of 1950 and early 1951 participated in negotiations with Levy for the acquisition of Liberty by American, which negotiation led to a verbal agreement with respect to the acquisition by American of I. H. Levy's holdings in Liberty, which agreement was reduced to writing but was never signed and was abandoned by American. In the *859 1951 negotiations' between Lichtenstein and Levy, it developed that while Levy wanted to sell his holdings in Liberty, he would not enter into any reconversion arrangement as a condition of sale, and Lichtenstein was advised that any reconversion was the problem of the purchaser.
American, in the latter part of 1950, acquired an interest in Domestic Finance Company, and because of difficulties later encountered with the remaining stockholders of Domestic, it became and was thereafter the policy of American not to purchase a minority interest in a company, unless at the same time some plan had been set up for the acquisition of all or substantially all of the stock or assets of the company sought to be purchased. As a result of this newly formulated policy, the 1950-51 deal with Levy was abandoned by American.
Thereafter, in the fall of 1953, Lichtenstein, on behalf of American, again negotiated for the purchase of Liberty with I. H. Levy and Edward J. Costigan, an investment banker and partner in Edward D. Jones & Company of St. Louis, Missouri, and at that time Lichtenstein recommended to Barnes that if it were possible to deal with Levy contingent upon not paying any money for the B stock ($1,500,000), unless the Class A stockholders agreed to the deal, that American, by raising its dividend from $1.60 to $1.80 as an inducement to the Liberty Class A stockholders, could afford to offer five-sixths of a share of American common for each share of Class A stock of Liberty. This proposal was not acceptable to Levy, but he made a counter proposal in late 1953, asking $1,800,000 for the B stock, and one share of American for one share of Class A stock of Liberty, which was refused by American, and negotiations between American and Levy were again broken off in late 1953 or early in 1954.
On February 1, 1954, Lichtenstein was granted a six months' leave of absence, and four days later Lichtenstein's duties as an executive vice-president of American were transferred to other American personnel by Barnes. Barnes instructed Lichtenstein not to thereafter do anything for American, and that American was not going to have anything to do with the Liberty deal. Levy learned of Lichtenstein's leave of absence in February, 1954, and he immediately contacted Lichtenstein and offered him a substantial stock interest in the Class B common stock of Liberty if he would come with Liberty in a management status. Within a few days after this offer by Levy, Lichtenstein advised Barnes of the offer, and during the conversation Barnes again told Lichtenstein not to do anything for American.
On April 15, 1954, Barnes concluded that Lichtenstein should resign from his office as executive vice-president of American, and on April 19, 1954, a committee was appointed to determine a pension to be given Lichtenstein by American. On May 24, 1954, the office of executive vice-president was abolished by American.
After the announcement of Lichtenstein's leave of absence from American on February 5, 1954, Lichtenstein and Levy met together on at least two occasions between that date and late May, 1954, and discussed the possibility of Lichtenstein heading the management of Liberty. Mr. Costigan, Mr. David J. Harris of the Chicago firm of Fairman & Harris, and Mr. Allen Nix of the New York firm of Riter & Company, investment bankers who had been responsible for placing a great many shares of Class A common stock of Liberty, were also desirous of obtaining new management for Liberty. Lichtenstein advised them in these conversations that he was not representing American.
On or about July 2, 1954, Key Finance Company (hereinafter referred to as Key), was formed, and all of the subscription rights to the Key stock were assigned to David B. Lichtenstein, Jr. The negotiations carried on by Levy and Lichtenstein culminated in Levy granting to Key an option to purchase 7,241 shares of B stock, which option provided for an outright sale, and was not subject to any contingencies. On July 19, 1954, Key exercised its option, and made an outright *860 purchase of the B stock with no contingency, condition, limitation or commitment on the part of the holders of A stock to reclassify said shares. On July 20, 1954, the Board of Directors of Liberty adopted an Employees' Stock Purchase Plan, covering not to exceed 115,000 shares of Class A stock, and pursuant thereto and on said date sold to certain officers 89,000 shares of Class A stock (of which 88,000 shares were sold to Messrs. Lichtenstein, and members of his family and Everett Best, William A. Gerard and Lyle S. Woodcock), subject to the approval of the stockholders of Liberty, and as of September 1, 1954, Liberty, Metropolitan Loan & Investment Company (hereinafter referred to as Metropolitan), and Metro Finance Company (hereinafter referred to as Metro), signed a Plan and Agreement of Merger, which provided among other things, for the conversion of the 7,500 outstanding shares of Liberty Class B stock into 100,000 shares of common stock of the surviving corporation, subject to the approval of the stockholders of the three corporations. On September 21, 1954, Liberty issued its proxy statement describing in detail the Employees' Stock Purchase Plan, the sale of stock thereunder, the Plan of Merger, and the proposed conversion of the 7,500 shares of Class B stock into 100,000 shares of common stock. The Employees' Stock Purchase Plan was represented to the stockholders of Liberty as having been created, and the shares thereunder sold, solely for the purpose of providing "management" for that company, and it was upon this basis that the Employees' Stock Purchase Plan was recommended for their approval. The Plan and Agreement of Merger was represented to the stockholders of Liberty as being advantageous to the company and its stockholders, partly because it would aid in providing "management" for that company, and it was upon the basis, in part, of such representations that the plan was recommended for their approval, and thereafter, on November 3, 1954, the stockholders of Liberty, relying upon such representations and recommendations, duly approved both the Employees' Stock Purchase Plan and the Plan and Agreement of Merger.
William A. Gerard and Lyle S. Woodcock were officers of American, and Everett Best was Research Director of Public Finance Company, a subsidiary of American, and, holding such positions, knew that American had negotiated with Liberty. On July 15, 1954, Messrs. Woodcock and Gerard terminated their employment with American, and thereafter joined Lichtenstein at Liberty, and on July 16, 1954, Mr. Best terminated his employment with Public Finance Company, and thereafter joined Lichtenstein in the management of Liberty. Messrs. Gerard and Woodcock each subscribed to 9,500 shares of Class A stock under Liberty's Employees' Purchase Plan, and Mr. Best subscribed to 1,000 shares of the same stock.
Between early February, 1954, and July 21, 1954 (the date of the public announcement to the Press), American had knowledge that Lichtenstein was dealing with Levy and Liberty, and that others, including Seaboard Finance Company, were dealing with Levy and Liberty, but did nothing towards effecting a purchase of any stock, assets or interest in Liberty.
It is not clear whether plaintiff contends that Lichtenstein violated his duty of loyalty to American, by (1), the mere acquisition of an interest in Liberty which was an "opportunity" belonging only to American, or, by (2), failing to disclose to American a plan or "idea" to purchase the B stock supplemented by merger, reclassification and Employees' Stock Purchase Plan, which plan or "idea" constituted a right, interest or "opportunity" belonging to American.
The theory of plaintiff's case in support of contention (1) is, that negotiations with Levy by American, in which Lichtenstein took part as an officer and director of American, thereby established a corporate "opportunity" belonging exclusively to American, and which precluded Lichtenstein from embracing, unless he first informed and offered to American, *861 his plan of acquiring an interest in Liberty. A duty to disclose based upon that theory, however, is dependent upon a finding that there was in fact an "opportunity" which American alone was privileged to undertake. The converse of the proposition would be, of course, that Lichtenstein was under no duty to disclose his plan or "idea" if American had not established a prior right to, or interest in, the so-called opportunity.
While corporate officers and directors are not technically trustees, they do, however, stand in a fiduciary relation to the corporation and its stockholders, and they are not permitted to exploit their position of trust and confidence to further their private interests. Guth v. Loft, Inc., 23 Del.Ch. 255, 5 A.2d 503. Whether or not an officer or director is to be deemed guilty of a breach of trust in a given situation or transaction, or series of transactions, is dependent upon the facts and circumstancespresented by the individual case.
From an examination of the cases it is at once apparent that the concept of what constitutes a "corporate opportunity", which a corporate officer or director is precluded from embracing in his individual capacity, is, to say the least, indefinite and uncertain. Some courts define a corporate "opportunity" as being property in which the corporation has an "interest or tangible expectancy", or which is essential to its existence. See Lacarde v. Anniston Lime & Stone Co., 126 Ala. 496, 28 So. 199; 3 Fletcher, Cyclopedia of Corporations, Sec. 861.1, p. 224 (Perm.Ed.).
In Durfee v. Durfee & Canning, Inc., 323 Mass. 187, 199, at page 204, 80 N.E. 2d 522, 529, the court approved the statement in Ballantine on Corporations, that "the true basis of the doctrine (corporate opportunity) should not be found in any expectancy or property interest concept, but in the unfairness on the particular facts of a fiduciary taking advantage of an opportunity when the interests of the corporation justly call for protection. This calls for the application of ethical standards of what is fair and equitable to particular sets of facts."
Inasmuch as the law of the State of Delaware is applicable here, plaintiff being a Delaware corporation, the case of Guth v. Loft, Inc., supra, was relied on for the purpose of determining its applicability to the factual situation presented by the case at bar. In the Guth case, Guth, the president and influential moving force of Loft, Inc., which was engaged in the manufacture and the sale of beverages, candy, etc., bought the Pepsi-Cola secret formula and trademark from a bankrupt organization, and with Pepsi-Cola's founder organized a new corporation with the aid of money from Loft, Inc. Guth used Loft's capital, plant facilities, materials, credit and employees to perfect the mixture, and the product was sold to Loft, among others, for distribution in its retail trade. The court stated, 5 A.2d loc. cit. 515:
"The facts and circumstances demonstrate that Guth's appropriation of the Pepsi-Cola opportunity to himself placed him in a competitive position with Loft with respect to a commodity essential to it, thereby rendering his personal interests incompatible with the superior interests of his corporation; and this situation was accomplished, not only and with his own resources, but secretly and with the money and facilities of the corporation which was committed to his protection." (Italics ours.)
It is obvious that the factual situation presented by the Guth case is not determinative of the judgment to be rendered, and does not impose upon this court the duty to find for the plaintiff in this case.
The test applied by the Delaware court in determining whether or not Guth's actions constituted a breach of loyalty to Loft, Inc., however, does set forth the test to be applied by this court. At page 511 of 5 A.2d of the court's opinion, which was adopted from 3 Fletcher, Cyclopedia of Corporations, Sec. 862 (Perm. Ed.), the following is stated:
"`The test seems to be whether there was a specific duty, on the part of the officer sought to be held liable, to act or contract in regard to the *862 particular matter as the representative of the corporation  all of which is largely a question of fact.'"
Can this court say then, that on the evidence presented, Lichtenstein was under a specific duty to act as the representative of American in his dealings with Levy after May 24, 1954, and, therefore, precluded from acquiring a personal interest in the undertaking? I think not.
Even though Lichtenstein, as an officer and/or director of the plaintiff, owed to it the duty of loyalty commensurate with his position, I cannot find on the evidence presented that Lichtenstein exploited or in any way abused the confidence of his trust.
The following facts lead the court to this conclusion:
(1) It was the policy of American, after its unfavorable experience with the Domestic Finance Company acquisition in 1950, not to purchase a minority interest in any company without a plan to acquire all or substantially all of the remaining outstanding interests.
(2) It was well known in the trade for several years that the Liberty B stock was for sale.
(3) The acquisition of the Liberty B stock, or the interest acquired by Lichtenstein, was not essential or of special and unique value to the business of American and its expansion.
(4) The evidence failed to disclose that American had adopted any formulated plan or objective to acquire the interest in Liberty acquired by Lichtenstein.
(5) The evidence discloses that at no time did Lichtenstein ever use or divert the funds, facilities, property or confidential information belonging to American for the purpose of accomplishing the purchase of interest in Liberty.
(6) There was no evidence that Lichtenstein intended, or ever intends to resell his interest to American.
(7) The evidence is that after February 1, 1954, Lichtenstein was instructed to do nothing further for American on the Liberty deal and on any corporate matters.
(8) There is no evidence that prior to February 1, 1954, Lichtenstein exerted whatever influence he may have had, or attempted to dissuade American from acquiring an interest in Liberty with the intent and purpose of diverting the so-called "opportunity" to himself.
(9) There is no evidence that in the negotiations for an interest in Liberty by American, Lichtenstein did not at all times act in good faith, and in the best interests of American.
(10) Even though the evidence does disclose that American and Liberty are in the same general business, there is no basis of finding that Lichtenstein's interest in Liberty places him in an adverse and hostile position to American  the fact is, that Lichtenstein and his family remain the second largest stockholders in American.
(11) The facts and reasonable inferences to be drawn therefrom disclose that American either abandoned any objective it may have had in acquiring or further negotiating for a very substantial interest in Liberty, or that American was not interested enough in such acquisition or further negotiation to act at a time when action on its part was imperative (Seaboard Finance dealings with Liberty, among others).
If it is plaintiff's contention that Lichtenstein violated his duty of loyalty to American by (2), failing to disclose his plan or "idea", then plaintiff had the burden of proving a right to, or interest in, the plan or "idea". In this the plaintiff has failed.
The plaintiff places considerable stress upon the fact that the idea was ingenious  in fact, a superb invention  but with this the court cannot agree. In 1951, when Lichtenstein negotiated on behalf of American with Levy, a similar plan with respect to the B stock was suggested, but it was unacceptable to Levy. Even if it is conceded that such a plan was not considered in 1951, the court *863 cannot agree with the plaintiff that the plan was a new idea. The Delaware statutes provide for mergers, etc., and many suits have been brought in the courts involving mergers and reclassification of stock.
While a minute search was not made of the cases in an effort to find a case with a plan exactly like the plan adopted in this instance, yet there is nothing new in the plan used. It was not a superb invention or a new idea, but merely the adopting of an old plan, which has been used many, many times, to the situation at hand.
The acquisition of an interest in Liberty by American was not essential, nor of great importance, to the corporate business success, as in Dowse v. Federal Rubber Co., D.C., 254 F. 308; nor was Lichtenstein under a contractual obligation to furnish the "idea", as in New Jersey Zinc Co. v. Singmaster, D.C., 4 F. Supp. 967; nor had Lichtenstein "used" American, as in Central Railway Signal Company v. Longden, 7 Cir., 194 F.2d 310, and Guth v. Loft, Inc., supra.
Plaintiff, at page 17 of its Suggestions in Reply, states:
"In the Guth case itself, cited by both parties, what Guth was obliged to return to Loft was the product of what was described as an "idea" (furnishing Pepsi-Cola in 12 ounce bottles at 5 cents) * * *"
The Delaware court, however, did not base its decision upon the failure to disclose the "idea", even though the idea in the Guth case was not a stereotype one such as we have here.
Although plaintiff's theory encompasses from "corporate opportunity" to "idea" to "disclosure", I believe at page 6 of its Suggestions in Reply, plaintiff sets forth the basic issue to be decided, when it quotes from Durfee v. Durfee & Canning, supra, and suggests that a fair construction of the Delaware law as expressed in Guth v. Loft, supra, will show that the "* * * true basis of the governing doctrine (right to relief) rests fundamentally on the unfairness in the particular circumstances * * *."
The real issue would, therefore, seem to be: Was the transaction (or failure to disclose), in view of all the surrounding circumstances, fraudulent, dishonest, unfair or inequitable?
Again, the facts do not indicate that Lichtenstein's acts or omissions were fraudulent, dishonest, unfair or inequitable, or in any way prejudiced American.
While American desired to expand, as is typical of most businesses, the evidence disclosed that it was not its policy to purchase a minority interest without some formulated and effective plan to acquire substantially all, if not all, of the remaining outstanding assets or interests. Lichtenstein purchased a minority interest, and his plan or "idea" went so far as to relinquish actual control over Liberty. Plaintiff alleges that it would have been ready, willing and able to embrace the Lichtenstein undertaking. However, what proof has it made of that allegation? None whatsoever.
The fact is that American stood still while others negotiated with Levy and Liberty. Lichtenstein's plan or "idea" was not a solution to the problem of "dilution", but rather, it only pointed to a solution, the solution being dependent upon the approval of the Liberty stockholders. The fair inference is that American did not want to purchase the B stock on that basis any more in 1954 than it did in 1951, but rather, wanted a guarantee that its stock would not be diluted by the purchase, before purchasing, which it could not get, and which Lichtenstein did not get.
As was said in the Guth case, supra, 5 A.2d at page 514: "As a general proposition it may be said that a corporate officer or director is entirely free to engage in an independent, competitive business, so long as he violates no legal or moral duty with respect to the fiduciary relation that exists between the corporation and himself."
*864 The testimony discloses that Lichtenstein violated no legal or moral duty in acquiring the B stock of Liberty with respect to the fiduciary relationship that existed between American and himself, and the court will accordingly find in favor of the defendant Lichtenstein on plaintiff's cause of action.
Since the plaintiff's case against Lichtenstein has failed, I have not in this memorandum gone into the merits of any of the defenses which the other defendants may have interposed.
Attorneys for the defendant Lichtenstein will prepare the Findings of Fact, Conclusions of Law and Judgment to be entered by the court, and submit same to the court for entry.